UNITED STATES of America,

v.

Cornell ROSS, Defendant.

Crim. A. No. 93–0089–RV–S.

United States District Court,
S.D. Alabama, S.D.

June 24, 1993.

Richard H. Loftin, U.S. Atty., Mobile, AL, for plaintiff.

Andrew M. Jones, Mobile, AL, for defendant.

## *ORDER*

VOLLMER, District Judge.

Defendant Ross is charged in a one-count indictment with having possessed two firearms as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Presently-pending before the court is defendant's pretrial motion to suppress, by which the defendant requests an order prohibiting the government from introducing at trial either of the two firearms made the basis of the indictment. Both firearms were taken from the defendant's car.

The court conducted a hearing on the defendant's motion on Friday, June 11, 1993, commencing at 9:00 a.m. At the conclusion, the court preliminarily indicated that it would deny the motion. The court since has carefully listened to the court reporter's audio tape of the hearing, reviewed the hearing transcript, and thoroughly examined the applicable law. Having done so, the court now is of the opinion that its initial decision to deny the motion was incorrect. Accordingly, for the reasons that follow, the court concludes that the defendant's motion is due to be, and hereby is, GRANTED.

1. The "testimony" was presented live during the court's June 11 hearing. The court also has before it two unnotarized statements of Dinkins, both of which appear to have been prepared shortly following the defendant's arrest and were appended as exhibits to defendant's motion to suppress. In ruling on the motion to suppress, the court primarily has taken into consideration only Dinkins' live testimony. Although there are slight differences between that testimony and the two unnotarized statements, the differences are not of such import as to affect the court's ultimate ruling on the motion.

## *Background*

### A. *Facts*

The testimony of Mobile County Sheriff's Deputy Barry Dinkins, Sr., the law enforcement official who participated in the seizure of the firearms made the basis of the present indictment and the sole witness to testify during the court's suppression hearing, establishes the following:[1] On the evening of January 14, 1992, at approximately 10:30, Deputy Dinkins, along with approximately six other armed law enforcement officials, were staking out a Motel 6 located just off of Dauphin Island Parkway in Mobile County. One other officer—a trainee—was riding in the car with Deputy Dinkins; the remaining officers were spread out in other cars, all of which were circling around the area of, or at least observing, the Motel 6 and its environs. The Motel 6 area was, at that time, known by Deputy Dinkins to be an area of high drug trafficking.[2]

Deputy Dinkins observed one car—a black and silver Cadillac Seville—circle the Motel 6 three or four times and then park in a parking space in front of the motel. That pattern of circling, combined with Dinkins's knowledge that the area of the motel was a high crime zone and Dinkins's observance that the driver of the car was riding low in his seat and appeared to be underage, led Dinkins and Richard Cayton, another Sheriff's Department deputy who also was involved in the stakeout but who was riding in another car, to decide to question the driver of the Cadillac. Accordingly, Dinkins and Cayton pulled their vehicles up behind the Cadillac, exited their vehicles, and approached the drivers' side of the Cadillac.

Upon approaching the drivers' side of the vehicle, Deputy Cayton asked the driver to

2. Deputy Dinkins, at the time of the stake out, had had at least nine years of law enforcement experience, two or three of which were spent with the Sheriff's Department. Dinkins was assigned to the Department's Narcotics Division. In his capacity as a law enforcement official, he was familiar with narcotics—particularly with crack cocaine, having seen crack at least 1000 times previously.

identify himself and for his drivers' license. The driver identified himself as "Cornell Smith" and stated that he did not have his drivers' license with him. (Only after the events made the basis of defendant's motion to suppress did Dinkins learn that Cornell Smith's real name was Cornell Ross, the defendant in this case.) Dinkins, having thereupon decided to issue Ross a traffic ticket for driving without a license, asked Ross to exit his vehicle. Ross did so.

Sometime after exiting his car, Ross, who was not wearing a coat, began to shiver in the cold night air. Rather than making Ross stand in the cold, Dinkins decided to place Ross in the back of his (Dinkins's) car [3] while he wrote out the traffic ticket. In his affidavit, Dinkins stated that he decided at that point to patdown Ross "for his [Dinkins's] safety to make sure [Ross] did not have any weapons while sitting behind him." [4] It is not clear where the patdown occurred: Dinkins testified at the hearing that he searched Ross while Ross leaned, front forward, on the driver's side door of the Cadillac; by affidavit, however, he testified that Ross was leaning on the back of the Cadillac during the search.[5]

Ross placed his hands on, and faced, the Cadillac during the patdown search. Dinkins began the patdown in Ross's chest area and moved downward. When Dinkins reached and patted Ross's pelvic area, he felt a "small box" tucked in Ross's groin; by touching the box, he immediately identified it as a hollow matchbox:

Q: You say you patted, and what did you feel?

A: As I got down to his groin area, I patted the box.

Q: How did you know it was a box?

A: I could feel the box, I mean a matchbox. I knowed it was a matchbox, it was square.

Q: You knew it was a matchbox?

A: It felt like a matchbox.

       *     *     *     *     *     *

Q: You guessed it was a matchbox—

A: From experience finding matchboxes.

Q: —by simply touching the Defendant?

A: Yes.

Q: If he had had this lighter in his pocket, could you have distinguished between this and a matchbox?

A: Probably would, because when I hit the matchbox it was hollow.

Q: It was hollow. So, you patted it further?

Q: Was part of your search involved in protecting yourself? If not, say so. Don't tell me it is because I asked the question. I'm asking you whether or not part of the reason that you took the matchbox from the Defendant prior to you putting him in your car was to protect yourself?

A: Yes.

Q: You are saying that that is part of why you took that particular matchbox and opened it up and looked into it?

A: That was the main reason because I was sitting him behind me.

Q: You were going to put him in the car behind you?

A: Yes.

---

**3.** On re-cross examination, Dinkins testified that he could not have placed Ross in the front of his car, because the officer-trainee with whom Dinkins had been riding that evening was sitting in that seat and needed to remain there so that he could observe Dinkins write out the ticket.

**4.** Dinkins' hearing testimony was much less clear on the crucial reason or justification for the patdown search. Although Dinkins testified at relative length about his reason for the initial pullover of Ross (*i.e.*, Ross was circling around the Motel 6, a known high drug trafficking area, and was slouched down low in the driver's seat, appearing much younger than he, in fact was), he did not provide *any* direct, unambiguous testimony on his reason for patting down Ross, *except* when asked leading questions by the court:

> Q: Let me ask you this, officer: I think you've already testified that you are aware that matchboxes were, you say, contraband. I take it when you say contraband, you're talking about cocaine?
> A: Drugs, crack cocaine.
> Q: When you were talking about that, did you earlier testify that there were also razor blades often kept with cocaine?
> A: Yes, sir, it is.

**5.** The location of the search is essentially immaterial to the issue before the court. Perhaps the location affects the extent to which the court should give credence to the officer's fear—not clearly articulated by the officer *sua sponte* or on questioning by Assistant United States Attorney Loftin and the defendant's attorney—that the defendant was perhaps armed and dangerous.

A: Yes.[6]

Dinkins was immediately suspicious of the box because of its location in the groin—an area in which drug traffickers were widely reported and known by Dinkins to carry drugs.[7] Dinkins immediately suspected that the box contained hidden contraband:

Q: When you felt the matchbox there, what, based on your experience, what did this lead you to believe?

A: After I felt it, it led me to believe that he was hiding some kind of contraband in the matchbox, the box that was inside—

Q: What led you to believe that?

A: Mostly, on numerous occasions that I've either ran somebody down or got out of the vehicle or check for known drug dealers, that's the normal place where they hide their dope now, is in their underwear in their groin area and stuff like that.

*The fact that the matchbox might contain contraband clearly was Dinkins's predominate concern at that point.[8]*

When asked if he was fearful, upon touching the "small box," that it might contain a weapon—specifically, a razor blade—[9] Dinkins stated: *"At that time I was mostly concerned that ... that it probably had some kind of contraband; but it also could have contained a razor blade."* His later testimony on cross examination was enlightening:

6. Dinkins gave similar testimony on redirect:

    Q: When you hit the matchbox and you determined it was hollow, did it make any sound consistent with anything being inside of it?
    A: I'd say just by me feeling it and hitting it, it seemed hollow to me, like an empty matchbox.
    Q: Did you shake it, did it make any sound at all, that you could tell?
    A: I didn't shake it, no, I didn't.

7. Dinkins testified that it was common for drug traffickers to carry contraband in small plastic, steel, or match boxes, or in plastic bags, in their groin area. In his years of experiences, in fact, Dinkins had found contraband, concealed in small match boxes tucked in the groin area, approximately 50–100 times.

8. Upon leading questioning by Assistant United States Attorney Rusty Loftin, it was established

Q: When you first touched it, you knew that it wasn't a weapon?

A: True.

Q: And then you proceeded to pat it and it felt hollow?

A: When I patted it, I knowed—from my experience I knowed it was a matchbox, my suspicion was it was a matchbox.

Q: In order for you to know it was a matchbox, you had to do more than pat it, you had to feel it, didn't you?

A: No, I just patted it.

\* \* \* \* \* \*

Q: When you felt this object, other than your guess or belief, or whatever you want to call it, that it was a matchbox, you did not know what was inside that, did you?

A: No, I did not.

Q: And at most, you were suspicious, it caused you to be suspicious; would that be accurate?

A: From prior finding contraband in matchboxes inside of suspected drug dealers' underwear or clothing, yes.

Q: You did not know what was in that box or object until after you had retrieved it from his pants and looked inside it?

A: *I had a suspicion that it contained contraband, yes.*

that drug traffickers oftentimes carry drug paraphernalia along with their illegal contraband. Such paraphernalia can include, according to Dinkins, pipes, tubing, and beer cans. Upon further, explicitly leading by Assistant USA Loftin (*i.e.,* "Have you found razor blades before?"), Dinkins stated that razor blades sometimes are also carried with crack cocaine, so that such can be used to "cut" the rocks. Dinkins also noted that a razor blade could be used as a weapon, in addition to being used to cut drugs.

    Q: If someone had a razorblade in, say, a matchbox they had hidden in their groin area, could that potentially be used as a weapon too?
    A: Yes, it could.

9. The precise question was: "When you found the matchbox in the Defendant's ... in the groin area, did you think that there might be a razor blade or some type of weapon in the matchbox or a possibility thereof?"

Dinkins thereafter retrieved the box, which was tucked inside Ross's underwear.[10] Dinkins then opened the matchbox and discovered that it contained "several pieces of a rock substance that led me to believe it was crack cocaine."[11] Ross thereupon was arrested for possession of cocaine.

A further search of Ross following his arrest produced a key from his shoe. The key, it was determined, opened the locked glove compartment of Ross's car. A search of Ross's glove compartment revealed the presence of two firearms—the weapons Ross is charged in the present indictment with having possessed. It is evident from Dinkins's testimony that the weapons were found pursuant to a post-arrest inventory search of Ross's car:

> A: ... After I had told the other officer that I had found the matchbox containing crack cocaine inside that box, I advised one of the officers to start an inventory of the vehicle....
>
> \*   \*   \*   \*   \*   \*
>
> Q: Was one of the reasons that you all searched the interior of the car to look for weapons?
>
> A: To do a complete inventory of the vehicle. In case anything is missing out of that vehicle, the wrecker company is responsible for it once we document it on the bailiff receipt.
>
> \*   \*   \*   \*   \*   \*
>
> Q: When you started searching the car after finding the matchbox, what were you all looking for?
>
> A: We didn't search the car. We did an inventory of the vehicle to also search for maybe any other weapon, weapons inside the vehicle, valuable items inside

the vehicle or more drugs in the vehicle as well.[12]

### B. *Defendant's Motion to Suppress*

Defendant maintains that the firearms are the fruits of an illegal search and seizure and, thus, cannot constitute proof against him as the victim of that search. More specifically, he asserts (1) that the weapons search of him, which produced the matchbox containing cocaine, was illegal because it was *not* based on a clearly articulated, reasonable suspicion that the defendant was then presently armed and dangerous with a potential instrument of assault; and (2) even if the *Terry* patdown was justified under the circumstances, the seizure of cocaine from his person was improper under the United States Supreme Court's recent decision in *Minnesota v. Dickerson.* Working from those premises, defendant concludes that his arrest for possession of cocaine was illegal, and the subsequent, related searches of his person and vehicle also were illegal. The defendant does not challenge the propriety of the inventory search of his vehicle, *assuming that the seizure of cocaine from his persons and his resulting arrest for possession of cocaine were legal.*

The government, in contrast, asserts that the search of Ross's car, and consequent seizure of firearms from Ross's glove box, were justified under *Terry* (*i.e.*, Dinkins had a right to conduct and, in fact, conducted, a protective patdown search of Ross's car), irrespective of the seizure of cocaine. Alternatively, the government maintains that (1) Officer Dinkins had the right to conduct a protective patdown of Ross; (2) the seizure of cocaine during the *Terry* patdown was appropriate under *Minnesota v. Dickerson;* (3) Ross's subsequent arrest for possession of

---

**10.** Dinkins testified that he probably asked the defendant to pull in his stomach, so that Dinkins then could see the matchbox and proceed to pull it out from Ross's underwear.

**11.** Having seen crack cocaine on at least 1000 prior occasions, Dinkins knew that the rocks contained in the box were crack cocaine.

**12.** Upon leading questioning by Assistant United States Attorney Loftin, Dinkins indicated that the

search of the car also was for protective purposes:

> Q: Did you also search the interior of the car for your own protection to look for weapons?
> A: Yes.

The court, as will be discussed, rejects the notion that the search of the car was for protective purposes. It is overwhelmingly apparent, from Dinkins's testimony and demeanor, that the weapons were found pursuant to a post-arrest inventory search of Ross's vehicle.

cocaine was legal; and (4) the resulting inventory search of Ross's vehicle was proper.

### Discussion

#### A. *Presumptions and Burdens of Proof*

■ One moving for the suppression of evidence recovered pursuant to a warrantless search bears the initial burden of persuading the trial court, by making specific factual allegations and offering supporting evidence, that the seizure of evidence was illegal and that the evidence, therefore, should be suppressed. *United States v. Evans*, 572 F.2d 455, 486 (5th Cir.) (citing *United States v. De La Fuente*, 548 F.2d 528 (5th Cir.1977); *Rogers v. United States*, 330 F.2d 535 (5th Cir.), *cert. den.*, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186 (1964)), *reh'g den.*, 576 F.2d 931, *cert. den. (sub nom.)*, *Tate v. United States*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).[13] Once the movant has established a basis for his or her motion, the burden then shifts to the government to prove, by a preponderance of the evidence, *see United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242, 253 (1974), that the seizure of evidence was legally and factually justified. *See United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir.), *reh'g den.*, 550 F.2d 1285, *cert. den. (sub nom.)*, *Stewart v. United States*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977).

#### B. *Analysis*

The Fourth Amendment, made applicable to the states by way of the Fourteenth Amendment, *see Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Searches conducted " 'outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.' " *Thompson v. Louisiana*, 469 U.S. 17, 19–20, 105 S.Ct. 409, 410, 83 L.Ed.2d 246 (1984) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted)). One important exception to the judge-made exclusionary rule—and the exception that is implicated by both of the government's arguments in this case—was recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

*Terry* held that in instances in which "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot": the officer may stop the suspicious person briefly and make "reasonable inquiries" geared toward confirming or dispelling his suspicions. *Id.* at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911. *Terry* further held that "when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous," either to himself or to others, the officer may conduct a patdown search for the limited purpose of determining "whether the person is in fact carrying a weapon." *Id.* at 24, 88 S.Ct. at 1881, 20 L.Ed.2d at 908; *see also Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

■ The scope of a *Terry* patdown is "limited to those areas in which a weapon may be placed or hidden." *See Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201, 1220 (1983). Such areas can include the passenger compartment of an automobile, *id.*, including the glove box. If the protective search exceeds the bounds of what is necessary to determine if the suspect is armed, it no longer is valid under *Terry*, and its fruits, therefore, must be suppressed. *Sibron v. New York*, 392 U.S. 40, 65–66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968).

■ When a challenge is made to a *Terry* patdown, the officer involved must be able to articulate clearly facts demonstrating that he had an objectively reasonable suspicion that the defendant was then-presently armed and dangerous with a potential instrument of as-

---

**13.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit Court of Appeals which were rendered prior to October 1, 1981.

sault. In the absence of such facts, evidence seized during or pursuant to the patdown must be suppressed.

As will be discussed, law enforcement officers may seize contraband detected during the lawful execution of a *Terry* search under certain, limited circumstances. *See Minnesota v. Dickerson,* —— U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). The extent of those circumstances is directly implicated by the facts of this case.

In the undersigned's opinion, the defendant has satisfied his burden of persuasion in this case—that is, the allegations contained in his motion to suppress, combined with the factual assertions made in Officer Dinkins's two unsworn, unnotarized statements, indicate that the two guns in this case were illegally seized. The court's remaining discussion, therefore, shall focus on whether the government has satisfied its burden of proving, by a preponderance of the evidence, that the guns were properly seized.

### 1. *Theory One: The Terry Patdown of the Car*

■ At the outset, the court rejects as factually meritless the government's assertion that the search of Ross's car—particularly of Ross's glove box—was permitted under *Terry*. Although the court recognizes that *Terry* authorizes a protective patdown of a suspect's vehicle under the circumstances noted above, the court concludes that such circumstances simply did not exist in the present case. Instead, based on the chronology of events in this case, the totality of circumstances that existed on the night in question, and the credibility determinations that this court is uniquely positioned to make, the undersigned concludes that the primary and, indeed, only reason for the search of Ross's car was to inventory its contents following Ross's arrest for possession of cocaine. The government's assertion that the guns were seized during a protective patdown of the car is nothing more than a

hindsight attempt to justify what the government fears, and the court hereinafter concludes, was an illegal search.[14]

### 2. *Theory Two: Guns and the Fruits of the Dickerson Tree*

In analyzing the facts of this case under the government's alternative theory, it is helpful to consider the discrete events leading up to the ultimate seizure.

**i.** *Step One: The Terry Stop.*—The first question raised by the facts of this case concerns the propriety of the officer's stop of Ross. The defendant does not challenge the officer's action in that regard, however, and the court, in upholding the validity of the stop, accepts Dinkins's explanation for his action. *See Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968) ("where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot" he may stop the suspicious person briefly and make "reasonable inquiries" aimed at confirming or dispelling his suspicions); *see also Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 616–17 (1972); *United States v. Franklin,* 972 F.2d 1253, 1257 (11th Cir. 1992).

■ **ii.** *Step Two: The Terry Patdown.*—Second, the facts of this case raise issues concerning Dinkins's right to conduct a protective *Terry* search of Ross *and* the scope of Dinkins's authority to do so. The government asserts that Officer Dinkins's *Terry* patdown was justified, inasmuch as Dinkins reasonably believed, based on specific and articulable facts, that Ross was then-presently armed and dangerous. Further, the government implicitly maintains that the *scope* of Dinkins's search was permissible under *Terry* and *Long*. Ross asserts that Dinkins has not and cannot clearly articulate facts demonstrating Dinkins's objectively

---

**14.** The court reaches this conclusion based on Officer Dinkins's own testimony. Although it may have been the case that an officer in Dinkins's position might have suspected, on the night in question, that Ross was carrying a weapon of assault in his car and posed a threat to him

and to others, Officer Dinkins, quite simply, *did not articulate or indicate such a fear.* Instead, Dinkins repeatedly stated that the automobile search, conducted *after* Ross's arrest, was made for inventory purposes.

reasonable suspicion that Ross was armed and dangerous on the night in question.

The court concludes that Dinkins, albeit on contrived, strained, and leading questions by the government and the court, articulated sufficient facts to support a finding that he objectively and reasonably suspected that Ross was armed and dangerous on the evening of January 12, 1992. Prior to his stop of Ross, Dinkins observed Ross for sometime, circling an area which was reputed to be a high drug trafficking location. Ross's circling behavior, combined with his suspicious crouching behavior while driving, gave Dinkins strong reason to believe that Ross was involved in criminal activity. That suspicion, strong as it was, continued, as the stop was effected and Ross exited his car. Believing that Ross might prove to be a threat when placed in the back of Dinkins's car, Dinkins made the deliberate and reasoned decision to frisk Ross prior to seating him in the back seat.

■ The court further concludes that Dinkins's patdown search of Ross did not exceed the lawful bounds of *Terry.* While patting down Ross, Dinkins found the matchbox in Ross's pelvic area—a place in which one reasonably can be expected to have secreted an instrument of assault. The matchbox was tucked inside Ross's underwear and was sensed by Dinkins without any intrusive or exploratory movements by Dinkins. The fact that Dinkins, upon locating the matchbox, immediately and predominately suspected that it contained contraband *does not* impugn the court's conclusion that the *physical scope* of the search was permissible.

■ iii. *Step Three: Discovering, Removing, and Opening the Box.*—Having determined that Officer Dinkins was justified in conducting a *Terry* protective patdown of the defendant and, further, having concluded that the patdown did not exceed the lawful bounds of *Terry,* an issue next arises concerning Dinkins's right to seize the crack cocaine from Ross during the execution of the *Terry* search. As noted, the Supreme Court has recognized that law enforcement officers, at least under certain circumstances, may seize contraband detected during the lawful execution of a *Terry* search. *See*

*Minnesota v. Dickerson,* —— U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

In *Dickerson,* the defendant, upon walking suspiciously out of an area known by police officers for drug traffic, was asked by two officers to submit to a *Terry* patdown search. The search revealed no weapons, but the officer conducting the search testified that he felt a small lump in the defendant's jacket pocket, believed it to be a lump of crack cocaine upon examining it with his fingers, and then reached into the pocket and retrieved a small bag of cocaine. Following the state trial court's denial of his motion to suppress the cocaine, the defendant was found guilty of possession of a controlled substance. The Minnesota Court of Appeals reversed, and the Minnesota Supreme Court affirmed that reversal. The government appealed the action to the United States Supreme Court.

Affirming the Minnesota Supreme Court's decision, the Supreme Court essentially concluded that the Fourth Amendment does not permit the seizure (and later introduction in court) of contraband detected through a police officer's sense of touch during a protective patdown search *unless* (1) the scope of the search is limited to that which is necessary to determine if the suspect is armed, and (2) the incriminating character of nonthreatening contraband detected—by sight or touch—during the appropriately limited search is "immediately apparent." Addressing the case at hand, the Supreme Court stated:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context.... 'The police officer in [such case would have] had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves

to supplement the prior justification ... and permits the warrantless seizure.'

*Id.* (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (Stewart, J.)).

In this case, the court already has determined that the first of the two elements of the *Dickerson* test has been satisfied. The second question, *appropriately divided in this case into two component parts,* thus remains: (a) was nonthreatening contraband detected, by sight or touch, during Dinkins's appropriate limited search, *and* (b) if so, was the incriminating character of the contraband detected "immediately apparent" upon touching?

Asserting that Dinkins's seizure of cocaine from Ross was permissible under the *Dickerson* "plain-feel" doctrine, the government breezes over the first of the foregoing component questions and urges the court to conclude that Dinkins's touching and recognition of the box in Ross's shorts as a matchbox that probably contained cocaine was tantamount to an instantaneous and sufficiently accurate identification of illegal contraband. Although conceding that Dinkins did not actually know, upon touching the matchbox, that the box contained cocaine, the government urges this court to equate Dinkins's reasoned and informed "suspicion" with the "immediately apparent" knowledge requirement of *Dickerson.* In other words, the government seeks to have this court bootstrap Dinkins's suspicion into actual knowledge of the incriminating character of the *contents of the matchbox* based on Dinkins's extensive law enforcement experience (and consequent familiarity with contraband and drug transactions) *and* on the unique location of the matchbox (tucked inside Ross's underwear, in a location in which a person is not likely to carry anything *other than* drugs).

The court cannot legitimately construe—or, more appropriately, contort—the holding of *Dickerson* as the government suggests. Instead, as the court reads *Dickerson,* the seizure of cocaine in this case would have been justified *only* if, upon touching the material tucked inside Ross's underwear, the incriminating character of the material as illegal contraband was "immediately apparent." Even if *Dickerson* were to permit a court to interpret "suspicions" as being tantamount to "knowledge," [15] the case would *not* admit of such construction in this case. That is so because of what Dinkins felt and suspected upon patting down Ross's pelvic area: Dinkins believed the item in Ross's underwear to be a box—he did *not* believe, sense, or suspect the *box* to be contraband, although he suspected that the box might *contain* illegal contraband.[16] The only way that Dinkins could have verified his suspicions concerning the contents of the box was if he removed the box and looked inside. Neither *Dickerson* nor *Terry* allow such action.[17] However reasoned and informed Dinkins's suspicions were in this case, they plainly were insufficient to allow the seizure of cocaine from Ross.

**iv.** *Step Four: The Arrest and Inventory Search.*—Since Dinkins's seizure of cocaine from Ross was clearly impermissible under *Dickerson,* the court concludes that the resulting arrest and inventory search were tainted as infamous "fruits of the poisonous tree."

### 3. *Miscellaneous*

The government, by its questioning of Dinkins, suggested during the suppression hear-

---

**15.** Indeed, "knowledge" under *Dickerson* really translates into "suspicion" if one considers that an officer cannot truly verify the illegal character of a substance without looking at it and, perhaps, testing it. The court's holding in this case might have been different if Ross has been carrying the cocaine simply in a plastic baggie in his pelvic area, through which the contours or mass of contraband could be sensed.

**16.** Dinkins testified that when he felt the matchbox he immediately recognized that it most probably contained illegal contraband because of its location—a favorite hiding place among drug traffickers for the storage and transportation of contraband. During the course of his *Terry* search, however, he "sensed" only the matchbox with his touch. It would strain credulity to conclude that by his sensing of the box the presence of cocaine therein was "immediately apparent" to Dinkins.

**17.** The proper course for Dinkins to have followed, it seems, would have been for Dinkins to arrest or to detain Ross for suspected possession of cocaine. Dinkins then could have sought a search warrant to look inside the matchbox.

ing that Dinkins was justified in seizing and opening the matchbox on the basis of its location alone—in the groin area; that Dinkins, based on his past experience, reasonably suspected that the box contained contraband. Further, that if the contraband was crack cocaine, a razor blade—a possible instrument of assault—could also be present. Based on the totality of the circumstances, as well as on the demeanor of Dinkins during the court's suppression hearing, the court finds from the Dinkins's testimony that Dinkins was not reasonably concerned—or, stated otherwise, did not reasonably suspect—that the matchbox contained an instrument of assault. Instead, based on credibility determinations that this court is uniquely positioned to make the court concludes that Dinkins was, at the time in question, concerned that the object secreted inside Ross's underwear contained contraband. Even though Dinkins testified that the matchbox might have contained a razor blade, that testimony, in the court's opinion, was not of real concern to the officer. Dinkins really was concerned, it seems, with whether the box contained drugs. He did not remove the matchbox from Ross so as to eliminate a possible and suspected threat to himself or to others; rather, he removed the box as part of what at that point had become a deliberate and focused search for drugs.

### Conclusion

In light of the foregoing, the court concludes that the ultimate seizure of firearms from Ross's car was constitutionally-impermissible. Accordingly, the firearms are due to be suppressed as the fruits of an illegal search, and defendant's motion is due to be, and hereby is, **GRANTED.**