UNITED STATES of America,

v.

Howard T. WINTER, et al.

Crim. No. 92–10008–H.

United States District Court,
D. Massachusetts.

June 4, 1993.

Memorandum and Order on
Reconsideration July 19, 1993.

**34**

Paul Markham, Boston, MA, for defendant Schiavo.

George W. Vien, U.S. Attorney's Office, OCDETF Div., Boston, MA, for U.S.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

This action comes before the Court on Defendant Kenneth Schiavo's Motion to Suppress $12,500 in United States currency and other items seized from him on November 4, 1991. The Government has opposed the Motion on the ground that these items were properly seized pursuant to a valid *"Terry-type* stop and frisk."

The seizure at issue in this case was the result of an investigation by federal agents and State Police into the alleged cocaine trafficking activities of the Defendants Howard Winter, Gennaro Farina and Kenneth Schiavo. The police had enlisted the aid of a cooperating individual (CI) to purchase cocaine from the Defendants. On the morning of August 1, 1991, this CI, wearing a recording device, was driving with Winter when the CI indicated that he wanted to purchase two kilograms of cocaine that day. After Winter placed a phone call at a public phone booth,

the CI and Winter drove to a parking lot in Brighton, Massachusetts, where Schiavo met them soon thereafter. Schiavo and Winter had a brief conversation in the parking lot, walked to some nearby telephones and then returned to their cars. Schiavo drove away in his car, while Winter left with the CI.

Winter and the CI then drove to a donut shop in West Upton where Winter, upon making a phone call, informed the CI that the cocaine would be delivered later that day. At noon, the CI and Winter met at the Golden Spoon restaurant in Hopkinton, where Farina arrived with a kilogram of cocaine that was given to the CI. The next evening, the CI met with Winter to deliver him $27,000 in payment for the cocaine. Once Winter had received the money and put it in his car, he used a nearby public phone. Telephone Company records indicate that he placed a call to Schiavo's residence.

On October 31, 1991, the CI picked up Winter and asked to purchase another kilogram of cocaine. Winter placed two calls from the CI's car phone. Telephone records show that the calls were placed to Schiavo's residence. The CI and Winter then drove to the Dunkin Donuts in West Medford, where Winter met with Schiavo for about five minutes and subsequently confirmed to the CI that the transaction would take place. Winter eventually delivered the kilogram of cocaine to the CI's house on November 1, 1991.

On November 4, 1991, the CI met with Winter at a restaurant in Sutton, and delivered $9,000 in serialized [1] purchase money as partial payment for the November 1 delivery of cocaine. After Winter left the delivery point, surveillance agents followed him to a bar in Webster, then to his house in Worcester, then to another bar in Worcester, and finally to the Chandlery Pub, a restaurant in Chelsea. He arrived at this restaurant more than two hours after having received the money from the CI. Other surveillance agents had followed Schiavo to the same restaurant earlier in the day and his car was still parked outside when Winter arrived. Winter went inside the restaurant, remained

---

1. Each of the bills had been photostated by the police prior to their delivery to Winter. The police gave this money to the CI for delivery in a white plastic bag.

inside for approximately twenty minutes, then exited and drove away. About five minutes later, Schiavo came out of the restaurant, entered his car, and drove away as well.

Trooper Thomas Duffy of the Massachusetts State Police, who had been keeping surveillance on Winter that morning, followed Schiavo from the Chandlery, eventually signalling him to stop on Broadway Street in Somerville, Massachusetts. Schiavo pulled into the parking lot of a nearby supermarket, parked the car and got out. Duffy approached Schiavo and asked him for his driver's license, which he produced. As part of a ruse to purportedly conceal the larger on-going investigation, Duffy identified himself as "Trooper Manning" and indicated that he was stopping Schiavo because he had seen him repeatedly hitting his brakes. Duffy did not, however, actually cite Schiavo for a motor vehicle violation nor did he place him under arrest for any offense.

While standing next to Schiavo, Duffy noticed a large bulge inside Schiavo's jacket, near the left side of his chest, and several times asked him if he had any weapons on him. Schiavo, in turn, repeatedly denied being armed. Duffy, acting without a search warrant, then conducted a limited pat frisk of Schiavo. In particular, he frisked about the bulge in his jacket and asked questions about it. After Schiavo stated it was a bag and again denied having any weapons on him, Duffy firmly instructed Schiavo to raise his hands and asked him what was inside the bag. When Schiavo responded, "Money," Duffy then took the brown bag from inside the jacket, opened it, looked inside and saw a white plastic bag containing $6,500 and matching the bag that the police had given the CI. He then took custody of this money, the bags and other amounts subsequently retrieved from Schiavo's pants pockets. Although the police had initially given the CI only $9,000 in serialized currency, Duffy seized the entire $12,500 he found on Schiavo because he was uncertain as to which bills constituted the serialized money. No search was made of Schiavo's vehicle. To allegedly further the investigation, Duffy then let Schiavo go without arresting him.

■ In justifying the search, the Government concedes that the search was not conducted pursuant to a search warrant nor as a search incident to arrest. It further acknowledges that the seizure was not incident to a search of the vehicle and does not contend it was consensual. Instead, the Government predicates the seizure upon a proper *Terry* stop and frisk. Although the Government does not rely upon probable cause for the search, I note in passing that Duffy did not have probable cause to believe that the money was in Schiavo's possession. More than two hours had passed between the CI's delivery of the money to Winter and Winter's arrival at the Chandlery. During this time, Winter stopped at several places, at any one of which he could have left the money. There was therefore not even probable cause to believe that Winter had the money in his possession when he entered the Chandlery. Further, no one ever saw Winter deliver any money to Schiavo at the Chandlery. Duffy conceded that he had only had a "hunch" that Schiavo had the serialized money when he left the Chandlery.[2] I consequently find that prior to stopping Schiavo, Duffy's hunch did not rise to probable cause to believe that Schiavo possessed the serialized currency. Although Duffy did not conduct a search of Schiavo's vehicle, I simply note that the evidence indicates that he would not, therefore, have had probable cause to support a warrantless search of Schiavo's vehicle. *See Carroll v. United States*, 267 U.S. 132, 158–59, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925).

■ Because the Government predicates its seizure upon an appropriate stop and frisk search, we must engage in a two-step examination pursuant to *Terry v. Ohio* to assess the validity of the search. *See* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *see also Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984) (routine traffic stop analogous to pedestrian "*Terry*" stop"). We must consider first, whether the stop was justified at its

---

**2.** This hunch only extended to the money being generally inside the vehicle. Duffy admitted that

he never anticipated that the money would be on Schiavo's person.

inception; and second, whether the action taken was reasonably related in scope to the circumstances that justified the intrusion in the first place. *See id.; United States v. Stanley,* 915 F.2d 54, 55 (1st Cir.1990). An investigatory stop by police officers is justified where the officers "have reasonable grounds to believe that the person detained was, is, or will be engaged in criminal activity." *United States v. Rodriguez–Morales,* 929 F.2d 780, 784 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). In this case, Schiavo's conduct in connection with this investigation was sufficient to give Duffy reasonable suspicion that he was involved in criminal activity. On the occasions that the CI told Winter that he wanted to purchase cocaine, Winter would immediately call Schiavo and meet with him. No one ever saw Schiavo pass drugs to Winter, but in each case, the cocaine was delivered soon after Winter had met with Schiavo. On the day of the search, police officers anticipated that Winter would deliver the money to Schiavo upon receiving it from the CI. Hours after the money was delivered to Winter, he went to the same restaurant as Schiavo and left only twenty minutes after arriving there. In light of knowledge gained by Duffy through the investigation and the conduct of Winter and Schiavo on the day of the search, Duffy had reasonable suspicion to believe that Schiavo had been involved in the sale of the cocaine to the CI. Therefore, even though Duffy lacked probable cause to believe that Schiavo possessed the money, he nonetheless had reasonable suspicion of his involvement in criminal activity sufficient to justify an investigatory stop.

 Having determined that the investigatory stop was justified, we next consider whether the action taken by Duffy in searching Schiavo was reasonably related in scope to the circumstances precipitating the stop. Under *Terry,* if a police officer conducting a valid investigative stop possesses a "reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a limited search

... of such persons in an attempt to discover weapons that might be used against him." 392 U.S. at 30, 88 S.Ct. at 1884. In this case, I find that upon effectuating the valid investigative stop, Duffy had a reasonable concern for his safety, justifying a limited search of Schiavo for weapons. At the time of the search, Schiavo was suspected of being a cocaine dealer and of having several thousand dollars on him from a delivery. Given the dangerous nature of Schiavo's alleged occupation, the large amount of money he was thought to have with him, and the hazardous nature of roadside encounters between police and suspects,[3] Duffy's fear that Schiavo might be armed was warranted and he was therefore justified in making a protective search for weapons.

 I next address the scope of that protective search. Because the sole justification of such a search is the protection of the police officer and others nearby, the search must be confined in scope to an intrusion that would reasonably allow the officer to ascertain whether a suspect is armed. *See id.; see also Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (discussing limits of protective search). The Supreme Court has emphasized the restricted nature of a protective search, stressing that "such a search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime." *Terry,* 392 U.S. at 29, 88 S.Ct. at 1884; *see also Sibron v. New York,* 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968) (contraband seized in *Terry* search must be suppressed where search is not confined to intrusion necessary to assure protection of officer); *United States v. Williams,* 822 F.2d 1174, 1179 (D.C.Cir.1987) (if real aim of search is discovery or preservation of contraband, search is not authorized by *Terry*.). Here, Duffy initially conducted a pat frisk of Schiavo's outer garments to see if Schiavo was armed. Duffy testified that after this frisk, he was still unable to ascertain whether Schiavo was carrying a weapon, and

---

**3.** *See, e.g., Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983); *Adams v. Williams,* 407 U.S. 143, 148 & n. 3, 92 S.Ct. 1921, 1924 & n. 3, 32 L.Ed.2d 612 (1972).

in fact, was even more concerned that Schiavo might have a weapon on him. Duffy also testified, however, that when he took the brown bag out of Schiavo's jacket, he "obviously" knew the bag did not contain a weapon, even before opening it. This testimony would indicate that Duffy's subsequent opening of the bag and examination of its contents were therefore not related to the sole justification for a protective search, namely the discovery of weapons.

More importantly, the evidence demonstrates that Duffy actually knew Schiavo was unarmed at an even earlier point. In the report he wrote following the search, Duffy noted that after stopping Schiavo, the suspect repeatedly indicated that he did not have any weapons on him. Significantly, Duffy then reported, "A limited pat frisk further affirmed Schiavo's assertions." In other words, Duffy's initial pat frisk of Schiavo's outer garments was sufficient to convince him that Schiavo was not carrying a weapon, thereby eliminating the sole justification for a further protective search. The aim of Duffy's further inquiry into the contents of the bulge in Schiavo's jacket, as well as the search of Schiavo's pockets, could not therefore have been the protection of himself and others, but was rather, the discovery and preservation of contraband. The record supports this conclusion insofar as the primary purpose of the stop, from the beginning, was to retrieve the contraband. Prior to the stop, Duffy may have anticipated being able to seize the money in "open view" on the front seat of Schiavo's vehicle. As he admitted, however, it was nonetheless his predetermined intention to seize the money wherever it was. He, in fact, even stated that one purpose of searching Schiavo was to find the serialized currency. A *Terry* frisk is not a viable means of pursuing that objective. *See* 392 U.S. at 29, 88 S.Ct. at 1884.

In sum, Duffy should have terminated his search as soon as he had ascertained that Schiavo was not carrying any weapons on him, which was immediately after the pat frisk of Schiavo's outer garments. The intrusion implicated by Duffy's reaching into Schiavo's jacket and pulling out the bag of money to examine it, after he had already determined that Schiavo was unarmed, exceeded the limited purpose of the protective frisk. All currency and other items seized after the initial pat frisk should therefore be suppressed. Accordingly, the Defendant's Motion to Suppress is allowed.

SO ORDERED.

## MEMORANDUM AND ORDER ON RECONSIDERATION

■ In light of the June 7, 1993 decision by the United States Supreme Court in *Minnesota v. Dickerson,* — U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), this Court has reconsidered its June 4, 1993 Order allowing Defendant Kenneth Schiavo's Motion to Suppress currency seized from him on November 4, 1991. In *Dickerson,* the Supreme Court held that police officers may seize non-threatening contraband detected during a *Terry*-type protective patdown search so long as the incriminating character of the contraband is "immediately apparent." *Id.* at —— – ——, 113 S.Ct. at 2136–37. In the present case, however, the incriminating nature of the bulge in the Defendant Schiavo's jacket as evidence of a crime was not "immediately apparent" to Trooper Duffy upon his initial pat frisk. At the suppression hearing, Trooper Duffy repeatedly asserted that he did not know what the bulge contained even after he had conducted the pat frisk.[1] In fact, he indicated that only after he had taken the bag of money from Schiavo's jacket and examined its contents was he able to determine what the bulge was. Because Trooper Duffy did not know what the

---

1. The following statements made by Trooper Duffy are illustrative of his repeated assertions: "After the pat frisk was conducted, I was not certain as to what the object was....."; "I wasn't able to determine what [the bulge] was with the pat frisk"; "When I did conduct the pat frisk initially, it was inconclusive to me what the item was"; and "I had no idea what was inside the bag

[upon seeing the bag subsequent to the pat frisk]."

The Court notes that even if Trooper Duffy did not know exactly what the bulge was after the pat frisk, the report he wrote following the search indicates that he knew that, whatever else the bulge might be, it was not a weapon.

bulge was after the initial pat frisk and because he needed to conduct a further, unwarranted search of the bulge and its contents to determine what it was, the "plain feel" doctrine espoused in *Dickerson* does not apply.

As to the Government's exigent circumstances argument, the Court reiterates that Trooper Duffy at no time had probable cause to believe that Schiavo possessed the serialized money. Consequently, the exigent circumstances justification does not apply.

In evaluating the circumstances surrounding this seizure, the Court notes that, from the very moment the police had provided the serialized money to the Cooperating Individual, they had planned to seize and repossess it as evidence, without any process nor incident to an arrest. The police had planned in advance to execute the seizure after a pretextual stop of the motor vehicle with the hopes that the money would be in "plain view" in the vehicle. If the money were not in "plain view," the money was still to be seized on the basis of any rationale which could be fashioned to justify the seizure. The "plain feel" doctrine recently explicated by the Supreme Court is the latest rationale offered in this case for what was clearly a prearranged seizure. Successful stratagems to fight drugs need not be designed to circumvent the Fourth Amendment.

In accordance with its above findings, the Court consequently reaffirms its June 4, 1993 Order allowing Defendant Schiavo's Motion to Suppress.

SO ORDERED.