UNITED STATES of America, Plaintiff,

v.

Oscar James MITCHELL, Defendant.

No. 4:92CR140–D–O.

United States District Court,
N.D. Mississippi.

Aug. 23, 1993.

**1074**

William C. Martin, Asst. U.S. Atty., Oxford, MS, for plaintiff.

William F. Travis, Southaven, MS, for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This case is before the court on defendant's motion to suppress evidence of contraband which was recovered from the defendant pursuant to a warrantless *Terry v. Ohio*[1] stop and feel weapons search. On July 1, 1993, the undersigned district court judge conducted a hearing on defendant's motion at the United States Federal Courthouse in Oxford, Mississippi. At the hearing, the court received the benefit of live testimony from the defendant and the participating law enforcement officers. Moreover, several items of physical evidence were received into evidence, and the court's own examination of these items has assisted the undersigned in the consideration of this motion. Furthermore, the court is assisted by the fact that defendant's motion to suppress is governed

by the recent United States Supreme Court decision in *Minnesota v. Dickerson,* — U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

██ For the reasons explained in this memorandum opinion, the undersigned finds merit to defendant's motion to suppress evidence, and the same will be granted by separate order issued this day. The discussion of facts which follows is important in understanding the court's conclusion that Mr. Mitchell's Fourth Amendment rights were violated.

### Facts

In September of 1992, the Greenville, Mississippi, Police Department received complaints of illegal gambling and drug trafficking occurring at the J & M Grocery on Theobald Street. Consequently, the Greenville Police Department decided to make an investigatory check-out of the premises.[2] The police had no warrant to execute on anyone, and the purpose of the stop was merely investigatory and to show a law enforcement presence in the community. On Wednesday, September 30, 1992, at approximately 8:00 p.m., four officers travelling in two separate vehicles pulled into the parking lot of the store. Two uniformed officers, Fulton and Monistere, were the first to arrive in a marked police car. Within seconds, Officers Kenny Trader and Jack Morgan, dressed in street clothes, pulled into the parking lot in an unmarked car and parked away from the marked police car. As the officers pulled into the parking lot, they observed a group of men huddled in front of the store. Some of the men in the group were standing while others were on their knees. However, upon seeing the police, the group disbanded. Oscar Mitchell, who had been in the group, walked away from the store at a hurried pace in the direction of the street. Mr. Mitchell was wearing a black leather jacket which was zipped to the neck, and his hands were in the front pockets of

---

**1.** 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**2.** Officers Trader and Morgan testified that the J & M Grocery was well known as a high crime area and a popular location for drug dealing.

The grocery was owned by James Merrill. According to Officer Trader, one Merrill brother (either John or James) had been convicted on a cocaine charge and the other brother had a previous drug related arrest.

his pants.[3] Officer Morgan, dressed in street clothes, hollered out, "police, stop," but Mitchell ignored the command and continued to walk away.[4] Upon being ordered to stop a second time, Mitchell complied with the command.[5] Then, Officer Morgan ordered Mitchell to remove his hands from his pockets, but Mitchell initially did not respond. After ordering Mitchell a second time to remove his hands from his pockets, Mitchell complied with the instruction. Immediately, Mitchell was ordered to drop to his knees. The defendant obeyed the order and dropped to his knees placing his hands, with fingers interlocked, behind his head. At this point, both officers began a pat down search for a weapon.[6] Officer Trader felt a bulge in defendant's left jacket pocket, and he called out to Officer Morgan, "I got something." At the hearing conducted before the undersigned, Officer Trader testified that he knew right away that what he felt was not a weapon. Officer Trader asked Morgan to feel Mitchell's left jacket pocket, and Morgan patted down the outer clothing of the pocket. Officer Morgan then asked Mitchell what was in his pocket. Mitchell allegedly gave a deep sigh but refused to answer. Next, Officer Morgan asked Mitchell to remove the object from his pocket, but Mitchell refused to comply. Morgan asked Mitchell a second time what the object was inside his jacket pocket, and still Mitchell refused to answer or respond to his question. In fact, Officer

Morgan testified that, "several times" he asked Mitchell what was in his pocket, but Mitchell never answered.[7] By this time, the uniformed officers had approached the area. Officer Morgan instructed Officer Eric Fulton to remove the object from Mitchell's pocket. Fulton reached into Mitchell's pocket and retrieved a brown paper sack. The paper sack contained a white athletic sock. Inside the sock, the police found six small plastic bags each containing a yellow/white rock like substance, which was determined later to be crack cocaine.[8] Officer Morgan then placed Mitchell under arrest for possession of cocaine with intent to distribute. Then, Mitchell was transported to the Greenville Police Station and processed at the Special Operations Office. At the station, the police removed a motel key, a bus ticket receipt, and approximately $692.00 in currency. The defendant refused a consent search of his motel room. Consequently, Officers Trader and Morgan submitted an affidavit for a search warrant and presented it to a Washington County Court Judge. The search warrant was executed by the judge later in the same evening. With the assistance of a drug sniffing dog, narcotics officers conducted a search of Mitchell's motel room. Underneath a night stand, the police recovered a plastic bag which held four smaller plastic bags containing crack co-

---

3. Although the incident occurred at approximately nightfall, Officers Trader and Morgan testified that it was still warm outside and that they were comfortably dressed in short sleeve T-shirts.

4. Mitchell testified that he did not hear the first command to stop.

5. In separate statements submitted by Officers Morgan and Trader on the day of the incident, September 30, 1992, both officers reported that upon the second order to stop, Mitchell "walked back" to Officer Morgan. However, the trial testimony of Officers Trader and Morgan was that Officer Morgan "ran around" Mitchell and stood in front of him.

6. Officer Morgan was behind Mitchell patting down the back and waist area. Officer Trader was in front of Mitchell.

Simultaneously with the pat down, Officer Morgan asked the defendant several questions, such as: his name; where he was from; how did he arrive in Greenville; where was he staying in

Greenville; and how did he get to the J & M Grocery. Mitchell was cooperative with these questions. Mitchell responded that his name was "Oscar Mitchell,"; he had arrived from California that day on a bus; he was staying with relatives in Greenville, but he could not remember the name of the street.

Mitchell did arrive that day on a bus from California. However, he was not staying with family members in Greenville. Mitchell had no family in Greenville, and he had rented a room at a local motel under the alias "Robert Smith".

7. Furthermore, in an affidavit to support a probable cause determination for a search warrant on Mitchell's motel room, Officers Trader and Morgan affirmed that Officer Morgan asked Mitchell "several times" what he had in his jacket, and each time Mitchell refused to answer. Government's Exhibit 7.

8. The amount consisted of approximately 36 grams.

**1076**

caine.[9] Additionally, the police found a Llama .357 Magnum wrapped in a towel and six rounds of ammunition which were found loose.

### Discussion

■ With a few exceptions, searches and seizures which are carried out beyond judicial sanction (without a probable cause warrant issued by a judge or magistrate) are *per se* unreasonable and proscribed by the Fourth Amendment. *Thompson v. Louisiana*, 469 U.S. 17, 19–20, 105 S.Ct. 409, 410, 83 L.Ed.2d 246 (1984); *United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978). One well known exception to the requirement of a prior determination of probable cause exists within the limited parameters of "reasonable articulable suspicion" as explained in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Known as the "stop-and-frisk" exception to the requirement of a warrant, the Fourth Amendment tolerates a warrantless stop (seizure) in order for an officer to make a reasonable inquiry to confirm or dispel his suspicions that criminal activity may be afoot.

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they are taken.

*Terry*, 392 U.S. at 30–31, 88 S.Ct. at 1884–85.

It bears emphasis that the scope of a *Terry* stop-and-frisk (feel) is strictly limited to that which is necessary to discover weapons which might be used to harm the officer or others. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). If the search extends beyond that which is necessary to determine if the subject is armed, then the search is no longer valid under *Terry*, and the fruits obtained will be suppressed. *Minnesota v. Dickerson*, —— U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993); *Sibron v. New York*, 392 U.S. 40, 65–66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968).

■ Another warrantless exception to the Fourth Amendment is found in the "plain view" doctrine. Simply stated, if the police are lawfully in a position (i.e., *Terry* stop) from which they view an object, and its incriminating character is immediately apparent, then the officers have a lawful right of access and may seize the object without a warrant. *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990); *Michigan v. Long*, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983). By the same token, if the police lack probable cause to believe that an object in plain view is contraband without further search and inquiry, then the object's incriminating character is not immediately apparent and the plain view doctrine will not support the object's seizure. *Minnesota v. Dickerson*, —— U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993); *Horton*, 496 U.S. at 136, 110 S.Ct. at 2307; *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

In *Minnesota v. Dickerson*, the Court considered whether the Fourth Amendment would support the warrantless seizure of contraband (crack cocaine) detected during a protective pat down search of the sort autho-

---

9. The police recovered a total amount of approximately 64 grams of cocaine from Mitchell, which included the amount confiscated at the J & M Grocery and the amount found in his motel room.

rized by *Terry*. However, instead of the "plain view" exception to the requirement of a probable cause warrant, *Dickerson* asked whether an officer's "plain feel" (via sense of touch) would support a warrantless seizure. The Court's answer in a 9–0 decision was, "yes," as long as the search remains clearly within the parameters established by *Terry* and its progeny.

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context.

*Dickerson*, —— U.S. at ——, 113 S.Ct. at 2137.

The Minnesota Supreme Court had rejected the "plain feel" analogy to plain view on two grounds. First, the Minnesota court was of the opinion that the sense of touch was inherently less immediate and less reliable than the sense of sight. Second, the court reasoned that the sense of touch is a more intrusive journey into one's personal privacy, which is the sum and substance of the Fourth Amendment. *State v. Dickerson*, 481 N.W.2d 840, 845 (Minn.1992). Noting that *Terry* itself recognized that the sense of touch is sufficiently reliable to detect the presence of weapons, the United States Supreme Court dismissed the Minnesota court's concern that the sense of touch is deemed less reliable than the sense of sight. *Minnesota v. Dickerson*, —— U.S. ——, ——, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993). "Even if it were true that the sense of touch is generally less reliable than the sense of sight, that only suggests that officers will less often be able to justify seizures of unseen contraband." *Id.* The Court's safety valve for any presumed sacrifice of reliability, assuming the sense of touch is less reliable, is the requirement that the officer have probable cause before seizing an object.

"[T]he Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures." *Id.*

In *Dickerson*, the Court cautioned that a key inquiry into the constitutionality of such impromptu searches is whether the officer remains within the boundaries set by *Terry* when the officer gains probable cause to believe that the substance is contraband. *Minnesota v. Dickerson*, —— U.S. ——, ——, 113 S.Ct. 2130, 2138, 124 L.Ed.2d 334 (1993). Under the facts of *Dickerson*, the Court concluded that the limits of a *Terry* safety search for a weapon were exceeded.[10] Therefore, the seizure of the contraband was unconstitutional.

> Here, the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to '[t]he sole justification of the search [under *Terry* :] ... the protection of the police officer and others nearby.' 392 U.S., at 29 [88 S.Ct. at 1884.] It therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize, see *id.*, at 26 [88 S.Ct. at 1882], and that we have condemned in subsequent cases. See *Michigan v. Long*, 463 U.S., at 1049, n. 14 [103 S.Ct. at 3481, n. 14]; *Sibron*, 392 U.S., at 65–66 [88 S.Ct. at 1904].

> \*      \*      \*      \*      \*      \*

> [ ... ] Although the officer was lawfully in a position to feel the lump in respondent's pocket, because *Terry* entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or by any other exception to the warrant requirement. Because this further search of respondent's pocket was constitutionally invalid, the seizure of cocaine that followed is likewise unconstitutional. *Horton*, 496 U.S., at 140 [110 S.Ct. at 2309].

---

**10.** In *Dickerson*, the scope of a *Terry* search was exceeded in so much as the officer had to manipulate, squeeze and slide the object before determining that it was contraband. *Dickerson*, —— U.S. at ——, 113 S.Ct. at 2138.

*Minnesota v. Dickerson,* —— U.S. ——, ——, 113 S.Ct. 2130, 2139, 124 L.Ed.2d 334 (1993).

■ For the case *sub judice,* the court perceives that defendant's motion to suppress requires a two step process. First, were the officers justified in stopping the defendant to investigate whether he might be engaged in criminal activity; and, assuming that there was adequate justification for the *Terry* stop, was the seizure of contraband within the limits of *Terry,* or were those limits exceeded.

■ On the evening in question, the Greenville police proceeded to the J & M Grocery upon citizen complaints of drug dealing and illegal gambling. The J & M Grocery had a reputation as an active spot for the illegal drug trade in Greenville. Upon arriving at the store, the police observed a group of grown men huddled in front of the store. According to Officer Trader, he recognized a couple of drug dealers in the group. Some of the men were kneeling while others were standing.[11] Upon noting the arrival of the police officers, the group quickly dispersed. Defendant walked toward the street at a hurried pace and ignored the first order to stop. Additionally, the defendant ignored the first order to remove his hands from his pockets. Furthermore, he was suspiciously dressed by wearing a leather jacket zipped to the neck. Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot, the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). Under the totality of the circumstances facing the officers, the officers were justified in detaining Mitchell in front of the J & M Grocery. Likewise, the officers were justified in believing that Mitchell might be armed and dangerous. Initially, Mitchell was uncooperative with the commands to stop and to remove his hands from his pants pockets, and he had been huddling with known drug dealers who typically carry weapons as a matter of custom.

In the case *sub judice,* these observations presented sufficient concern to place Mitchell at a position of disadvantage and conduct a pat down frisk for a weapon. As noted above, it is well settled that the police may pat down a detainee's outer clothing for weapons if, under the totality of the circumstances, the officer harbors a reasonable suspicion, based on articulable facts, that the detainee is involved in criminal activity and that the detainee may be armed. In such cases, a pat-down is reasonable and necessary to protect the officer and others from harm. *Minnesota v. Dickerson,* —— U.S. ——, ——, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993); *Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1885, 20 L.Ed.2d 889 (1968); *United States v. Rideau,* 969 F.2d 1572, 1574 (5th Cir.1992); *United States v. Johnson,* 932 F.2d 1068, 1069 (5th Cir.1991). The court now considers, having determined that a *Terry* investigatory stop and a pat down search for a weapon were warranted under the circumstances, whether the seizure of contraband was within or outside the constitutional parameters authorized by *Terry.*

After careful study and deliberation, the court concludes that the police, under the facts of this case, exceeded the limits of a *Terry* search. At the hearing held before the undersigned on July 1, 1993, Officers Trader and Morgan testified, on direct examination, that the crack cocaine in defendant's left jacket pocket was "immediately apparent" upon feeling the outer pocket of the jacket. Officer Trader was an eight year veteran of the police force, and he testified that he had worked approximately 300 drug cases in his career. Officer Morgan had ten years of law enforcement experience, four years with the Air Force security police and six years with civilian law enforcement. According to Officer Morgan, he had worked approximately 300–500 drug cases throughout his career. The court recognizes that both officers were seasoned veterans equipped with sharp instincts. Both officers possessed skills which can be obtained only through training and cumulative experience in drug enforcement cases. With all due

---

**11.** The officers testified that this configuration (some kneeling, some standing) in a huddled group was consistent with illicit gambling activity.

respect and deference to the training and skills of these officers, the court does not, and can not, accept their testimony that the crack cocaine in Mitchell's pocket was "immediately apparent" to them upon patting the outer clothing. Without question, the officers likely possessed a strong hunch (speculation), prompted by their training and experience, that the pocket contained cocaine. However, for an immediate probable cause determination, this does not suffice. The undersigned's careful inspection of the physical evidence in the case *sub judice* yields this conclusion.

The crack cocaine which was removed from the defendant was contained in six small plastic bags. The plastic bags were wrapped in a white athletic sock. The sock was in a brown paper bag which the defendant carried in the left pocket of a black leather jacket. Upon examining Mitchell's jacket, the court observed that the jacket is made from a dense, heavy grade of leather, and the inside pockets were lined with a soft textured material. In order to feel the crack cocaine, one must possess acute sensory perceptions allowing a determination of the substance's identity by feeling through a layer of leather, lining, paper, cloth material, and plastic. In short, the court is not convinced that under the facts of this case, an "immediately apparent" determination of contraband is within the realm of human capability with a single pass of one's hand over the outer clothing.

Furthermore, when Officer Trader began the initial pat down of Oscar Mitchell, Mr. Mitchell was in a kneeling position (knees on the ground) with his hands locked behind his head. After the initial pat down, Officer Trader knew that Mitchell was not carrying a weapon. At that point, the officers were out of the *Terry* zone of danger. In other words, the objectives of a *Terry* search for a weapon had been fulfilled. However, the search was continued when Officer Morgan felt of the area outside of the pocket and when Officer Fulton reached into the pocket to retrieve the paper sack. After concluding that Mitchell was unarmed, the continuation of the search by the officers transformed the encounter from a weapons search into an evidentiary probe. As emphasized in *Minnesota v. Dickerson*, —— U.S. ——, ——, 113 S.Ct. 2130, 2138, 124 L.Ed.2d 334 (1993), such evidentiary searches are of the type that *Terry* expressly refused to authorize. *See Michigan v. Long*, 463 U.S. 1032, 1049 n. 14, 103 S.Ct. 3469, 3481 n. 14, 77 L.Ed.2d 1201 (1983); *Sibron v. New York*, 392 U.S. 40, 65–66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968); *Terry v. Ohio*, 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968).

For the reasons explained in this memorandum opinion, the defendant's motion to suppress evidence is well taken, and the same will be granted by separate order to be issued this day. It also follows that under authority of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the additional evidence of contraband which was retrieved from defendant's motel room will likewise be suppressed by operation of the rule of law articulated in *Wong Sun*, known as the "tainted fruit of the poisoned tree" doctrine.