(929 P.2d 792)
No. 74,601

STATE OF KANSAS, *Appellee,* v. VERNON WONDERS, *Appellant.*

Opinion filed December 27, 1996.

*Jean K. Gilles Phillips*, assistant appellate defender, *Patrick Dunn*, student intern, and *Steven R. Zinn*, deputy appellate defender, for appellant.

*Mary A. McDonald*, county attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before GREEN, P.J., KNUDSON, J., and ERIC S. ROSEN, District Judge, assigned.

GREEN, J.: Vernon Wonders appeals his convictions for possession of cocaine and possession of marijuana. Wonders raises three principal issues in this appeal: (1) whether the sheriff's deputy had an articulable suspicion that Wonders was involved in a criminal activity, justifying the deputy's temporary seizure of him; (2) whether the deputy feared for his safety, justifying a pat-down search of Wonders; and (3) whether the plain feel exception should be adopted in Kansas and, if so, whether the deputy exceeded the scope of a search under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Because we find that the search exceeded the scope of a *Terry* frisk, we reverse the judgment of the trial court.

On March 7, 1994, sheriff's deputy Kurt Ford stopped a car when its driver failed to signal a lane change. The driver, Albert Garcia, explained and demonstrated that his turn signal was broken. When Ford noticed an odor of alcohol, he had Garcia perform several dexterity tests. After determining that Garcia was not intoxicated, Ford told Garcia that he was free to go. Ford testified that at this point he had no reason to believe that any criminal activity had occurred. Nevertheless, Ford asked Garcia if he had any guns, drugs, drug paraphernalia, or stolen property in his car. When Garcia replied that he did not, Ford asked and obtained Garcia's permission to search his car.

Ford testified that before searching the car, he asked the three passengers, including Vernon Wonders, to get out of the car. Under an armrest in the middle of the front seat, Ford discovered a hand scale. Under the front seat, Ford found a chrome pipe with a burnt end and with burnt residue inside. In the front ashtray, Ford found a wood and brass pipe, also with burnt residue inside; and in the front seat, he found two packs of ZigZag rolling papers. Ford testified that based upon his experience, the items were drug paraphernalia. Ford further testified that when he discovered these items, they caused him to believe that some criminal activity had occurred or was occurring. As a result, Ford feared for his safety and wanted to pat-down the car's occupants for weapons. By that time, two other officers had arrived at the scene.

When Ford patted down Wonders, he discovered rolling papers and three plastic baggies containing marijuana in Wonders' front right jean pocket. As a result of this discovery, Wonders was arrested. An inventory search at the jail revealed a plastic packet of crack cocaine in Wonders' front shirt pocket. Wonders was charged with possession of both substances. Wonders filed a motion to suppress evidence of the drugs, arguing that the search of his person was invalid. The trial court denied the motion and found Wonders guilty of both possession of marijuana and possession of cocaine.

On appeal, Wonders argues that the search and seizure violated his right against unreasonable search and seizure because no reasonable suspicion existed to conduct a *Terry* "stop and frisk." For purposes of narrowing the analysis of this issue, it is equally important to note that Wonders does not challenge the initial stop of the car, the later DUI investigation, or the search of the car.

In *State v. Anderson*, 259 Kan. 16, 18, 910 P.2d 180 (1996), our Supreme Court articulated the following standard in reviewing a motion to suppress where the facts are not in dispute:

"If the findings of the trial court on a motion to suppress evidence are based on substantial evidence, this court on review will not substitute its view of the evidence for that of the trial court. *State v. Chiles*, 226 Kan. 140, 144, 595 P.2d 1130 (1979). When the facts material to a decision of the court on a motion to suppress evidence are not in dispute, the question of whether to suppress becomes a question of law. *State v. Vandiver*, 19 Kan. App. 2d 786, 788, 876 P.2d 205

(1994), *aff'd* 257 Kan. 53, 891 P.2d 350 (1995). An appellate court's scope of review on questions of law is unlimited. *State v. Heffelman*, 256 Kan. 384, 386, 886 P.2d 823 (1994). Further, on a motion to suppress evidence, the State bears the burden of proving to the trial court the lawfulness of the search and seizure. *State v. Damm*, 246 Kan. 220, 222, 787 P.2d 1185 (1990) (citing *Mincey v. Arizona*, 437 U.S. 385, 390-91, 57 L. Ed. 2d 290, 98 S. Ct. 2408 [1978])."

The evidence presented consisted of Ford's testimony and the physical evidence found during the searches. Ford was the sole witness at both the preliminary hearing and the suppression hearing. Because no material facts are in dispute, this is a question of law, and this court's scope of review is unlimited.

The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, *Mapp. v. Ohio*, 367 U.S. 643, 655, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, (1961), guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[S]earches and seizures ' "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." ' [Citations omitted.]" *Minnesota v. Dickerson*, 508 U.S. 366, 372, 124 L. Ed. 2d 334, 113 S. Ct. 2130 (1993).

## Stop and Frisk

In *Dickerson*, 508 U.S. at 373, the Court recited the *Terry* exception: " '[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . .,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." See *Terry*, 392 U.S. at 30; *State v. Waddell*, 14 Kan. App. 2d 129, 132, 784 P.2d 381 (1989). An officer may also conduct a pat-down search where the officer is justified in believing that the person is armed and dangerous to the officer or others. *Terry*, 392 U.S. at 24. However, this protective search must be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or

others nearby." 392 U.S. at 26; see *Dickerson*, 508 U.S. at 373; *Waddell*, 14 Kan. App. 2d at 132.

K.S.A. 22-2402 codifies the principles set forth in *Terry* and provides:

"(1) Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand . . . the name [and] address of such suspect and an explanation of such suspect's actions.

"(2) When a law enforcement officer has stopped a person for questioning pursuant to this section and reasonably suspects that such officer's personal safety requires it, such officer may frisk such person for firearms or other dangerous weapons. If the law enforcement officer finds a firearm or weapon, or other thing, the possession of which may be a crime or evidence of crime, such officer may take and keep it until the completion of the questioning, at which time such officer shall either return it, if lawfully possessed, or arrest such person."

Although "stop and frisk" is codified at K.S.A. 22-2402, " 'police conduct in a "stop and frisk" situation must be judged under the reasonable searches and seizures clause of the Fourth Amendment to the Constitution of the United States.' " *State v. Potter*, 246 Kan. 119, 121, 785 P.2d 989 (1990) (quoting *State v. Jackson*, 213 Kan. 219, 222, 515 P.2d 1108 [1973]).

Articulable Suspicion

Wonders argues that because Ford did not have an articulable suspicion that Wonders was involved in a criminal activity, his seizure was unreasonable. In support of his argument, Wonders cites *State v. Damm*, 246 Kan. 220, 787 P.2d 1185 (1990); however, the facts of that case are distinguishable from this case. In *Damm*, a car was stopped for a traffic violation. At the time of the stop, the officer demanded identification from the driver and the passengers. The officer did not have reason to suspect that the passengers were involved in any criminal activity because the sole reason for the stop was the traffic violation. The officer took the identification and discovered that one of the passengers was subject to a warrant for his arrest. The officer arrested the passenger, searched the car, and discovered drug paraphernalia in the car. In upholding the suppression of the evidence, our Supreme Court determined that

the seizure of the passengers was unreasonable because the existing facts failed to support such an action. 246 Kan. at 225.

In the present case, the driver consented to the search of his car. The possession of drug paraphernalia is a misdemeanor violation. See K.S.A. 65-4152. When Ford discovered the drug contraband in the car, he had an articulable suspicion that a crime was either occurring or had been committed by one or more of the occupants of the car. Because Wonders was one of the occupants of the car, Ford had an articulable suspicion that Wonders may have committed a crime.

## Pat-down Search

Next, Wonders cites *State v. Vandiver*, 257 Kan. 53, 891 P.2d 350 (1995), for the premise that just because he was a passenger in the car where the drug paraphernalia was discovered, this alone did not justify Ford's seizure of him. But *Vandiver* is also factually distinguishable from this case. In *Vandiver*, a search warrant had been issued upon a probable cause finding that a certain individual was selling marijuana and that the marijuana was being packaged and sold from his residence. When the warrant was executed, persons other than the individual named in the search warrant were searched. Marijuana was discovered on Vandiver. Finding that the seizure of Vandiver was unreasonable, the *Vandiver* court stated:

"[T]he police may search a non-resident visitor or the visitor's belongings in the course of executing a warrant for a premises search. These circumstances include: where the individual consents to being searched, where the item is in plain view on the person or in the person's possession, where there has been a valid arrest, and where there is probable cause to search plus exigent circumstances. A search may also be conducted under the *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), exception which allows a stop and frisk where there is a reasonable belief that the person is armed and dangerous." 257 Kan. 53, Syl. ¶ 3.

Here, Ford met the last exception under *Vandiver*. He conducted a *Terry* search of Wonders. Although Wonders argues that he did not give Ford any reason to fear for his safety, Ford testified that he feared for his safety. To the contrary, in *Vandiver*, there was no showing that the officer feared for his safety. In *State v. Jackson*, 213 Kan. at 225, our Supreme Court stated:

"[I]n order to justify the search for weapons authorized under the provisions of subsection (2) of 22-2402, the officer must have prior knowledge of facts or observe conduct of the person . . . which, in the light of his experience, would cause the officer to reasonably suspect that his personal safety requires such search."

Here, Ford had just discovered evidence of illegal drug activity. People who sell or use drugs can be very dangerous. The occupants of the car outnumbered Ford. The stop occurred on the side of a highway. One of the occupants of the car was known by Ford for his violent behavior and flight risk. Consequently, Ford's fear for his safety was reasonable; therefore, a pat-down search of the occupants of the car for weapons was warranted.

## Plain Feel Exception

Next, Wonders argues that if we determine that Ford's pat-down search of him was justified, we should not adopt the "plain feel" exception recognized in *Dickerson*, 508 U.S. 366. In *Dickerson*, the defendant was leaving an apartment building known by the police for drug trafficking. Upon seeing police officers, the defendant changed directions and began walking away. The officers became suspicious and ordered the defendant to submit to a pat-down or *Terry* search. Although the officer did not find any weapons, he felt a small lump in the defendant's jacket. The officer testified that the lump " 'slid and it felt to be a lump of crack cocaine in cellophane.' " *Dickerson*, 508 U.S. at 369. The officer then reached into the jacket and removed a small bag of crack cocaine. Following the trial court's denial of his motion to suppress, the defendant was found guilty of possession of a controlled substance. The Minnesota Court of Appeals reversed, and the Minnesota Supreme Court affirmed that reversal. The State appealed to the United States Supreme Court.

In affirming the Minnesota Supreme Court, the United States Supreme Court recognized the plain feel corollary to the plain view exception to the Fourth Amendment. In comparing the plain view and plain feel exceptions, the Court stated:

"If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been

no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." 508 U.S. at 375-76.

The Court added in a footnote: "[T]he police officer in each [case would have] had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." 508 U.S. at 376, n.3 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 29 L. Ed. 2d 564, 91 S. Ct. 2022, *reh. denied* 404 U.S. 874 [1971]). The Court concluded that a patdown search, such as the one permitted by *Terry*, must stay within the bounds marked by *Terry*. This means the search must be limited to the discovery of weapons.

As stated earlier, the Fourth Amendment was made applicable to the states in 1961. The Kansas Supreme Court has interpreted § 15 of the Kansas Constitution Bill of Rights as having the identical scope as the Fourth Amendment. See *State v. Deskins*, 234 Kan. 529, 531, 673 P.2d 1174 (1983). Wonders correctly points out that although the Fourth Amendment and § 15 of the Kansas Constitution Bill of Rights are nearly identical in wording, our Supreme Court may construe § 15 independent of the Fourth Amendment. Moreover, the Kansas Supreme Court may interpret the Kansas Constitution to afford Kansas citizens more protection from governmental intrusion than that granted by the United States Constitution. See *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993). Nevertheless, because our Supreme Court has never extended state constitutional protections beyond federal guarantees, we believe the adoption of the plain feel exception is consistent with precedents of our Supreme Court. 252 Kan. at 826.

## Scope of a *Terry* Frisk

Next, Wonders argues that Ford's pat-down of him exceeded the scope set out in *Dickerson* and *Terry*. Although the United States Supreme Court recognized the plain feel exception, it determined that because the officer never thought the lump was a weapon, squeezing, sliding and otherwise manipulating the pocket's contents constituted an unlawful search. The Court held that

while *Terry* entitled the officer to place his hands on respondent's jacket and to feel the lump in the pocket, his continued exploration of the pocket after he concluded that it contained no weapon was unrelated to the sole justification for the search under *Terry*. 508 U.S. at 379. To determine whether Ford's search was lawful, we must analyze in detail the facts surrounding the search.

At the preliminary hearing and during the suppression hearing, Ford testified that he conducted an initial pat-down of Wonders' entire body. Ford testified that this initial search did not reveal any weapons or bulges which might be weapons. Ford returned to the left front pants pocket, where he had felt a bulge, and searched the pocket again by placing the palm of his hand flat on the object. The initial search took from 10 to 12 seconds. Ford's second search of the front pocket lasted approximately 3 seconds. Next, Ford asked Wonders what was in his pocket. When Wonders did not answer, Ford reached in and removed the pocket's contents. Ford testified that "Mr. Wonders' initial pat-down revealed rolling papers and clear plastic baggies containing green vegetation." Specifically, Ford removed a lighter, a package of Randy's brand rolling papers, and three clear plastic baggies of marijuana. The record does not indicate the order in which the items were removed from the pocket. Ford testified that he did not manipulate, squeeze, or push the pocket's contents because it was "immediately apparent" to him that the pocket contained a baggie of marijuana. Ford testified as follows:

"Q. [Defense counsel] Okay. And when you patted him down did you first pat-down his chest?

"A. Yes.

"Q. And you didn't find anything?

"A. No.

"Q. Then you started down to the lower body. Did you just pat him down completely first or did you go directly to his front pocket?

"A. It was a complete pat-down initially.

"Q. And during that initial pat-down of the lower body did you find any bulges that would make you think there was a weapon?

"A. No.

"Q. But you went back and then searched his pocket?

"A. The—I felt—what I did feel in his pant pocket was a bulge, and I did at that time ask Mr. Wonders what was in his pocket, there was no reply, and that's when I did locate the marijuana in his pocket.

"Q. But it wasn't a bulge that would indicate to you there was a weapon in the pocket?

"A. No."

In denying Wonders' motion to suppress, the trial court stated:

"Deputy Ford was in the midst of his pat-down search when his palm touched the front pocket containing the bulge. He completed his pat-down before returning to the bulge, although he testified that he knew immediately that it was, in fact, a baggie of marijuana. Thus, in this case, there was none of [the] squeezing, sliding and manipulating of the object which the *Dickerson* court found to be prohibited."

In concluding that its determination was based mainly on the officer's credibility, the trial court stated:

"In order for the Court to grant the motion to suppress, I would have to find that the testimony of the officer lacked credibility when he stated that it was immediately apparent to him when he was patting down the defendant that the bulge in his front pocket was a baggie of marijuana. I would likewise have to discredit his testimony that a baggie of marijuana in this situation has a 'consistent feel'. Given the training and experience of the officer, the Court cannot do this."

The trial court's analysis departs significantly from that of the United States Supreme Court in *Dickerson*. Specifically, the United States Supreme Court analyzed the facts surrounding the search to determine whether the search exceeded the scope of *Terry*. Here, the trial court's memorandum does not address several factors surrounding the search. For example, Ford testified throughout the hearing that he was searching for weapons as well as drugs and paraphernalia. Ford specified that his search was not limited to a search for weapons. Further, Ford testified that after determining that Wonders was not armed, he initiated a second search of Wonders' front pants pocket. Ford then asked Wonders what was in the pocket. Each of these factors implies that the contents of the pocket were not immediately apparent to Ford. However, the trial court's memorandum does not address these facts.

The trial court gave great weight to Ford's testimony that the contents of the pocket were immediately apparent to him. Likewise, in *Dickerson*, the officer testified that despite never thinking the lump was a weapon, he did believe that it was crack cocaine. In fact, he was " 'absolutely sure' that the substance was crack

cocaine." *State v. Dickerson*, 481 N.W.2d 840, 849 (Minn. 1992). While the United States Supreme Court considered this testimony, it was not dispositive. The Court also discussed the fact that the officer continued his search after he determined that Dickerson was not armed. The Court found that "the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to '[t]he sole justification of the search [under *Terry:*] . . . the protection of the police officer and others nearby.' [Citation omitted.]" *Dickerson*, 508 U.S. at 378. Because the Minnesota trial court did not make specific findings as to when the officer in *Dickerson* determined the nature of the contraband, it is unclear what weight the Court gave to the officer's testimony. However, it is clear that the officer's testimony as to his knowledge concerning the contraband did not end the Court's inquiry.

In its written decision denying the motion to suppress, the trial court cites two recent cases: *United States v. Ashley*, 37 F.3d 678 (D.C. Cir. 1994), and *United States v. Craft*, 30 F.3d 1044 (8th Cir. 1994). As Wonders correctly argues, these cases are distinguishable, as both concern consent searches. While the *Ashley* and *Craft* courts cited *Dickerson* in determining whether the scope of the consent searches exceeded the consent given, the analysis is markedly different from the analysis of a *Terry* search. Consequently, these cases are not very helpful. However, some courts have applied *Dickerson* to *Terry* stops factually analogous to the instant case.

For example, in *United States v. Mitchell*, 832 F. Supp. 1073 (N.D. Miss. 1993), officers observed a group of men huddled in front of a store. The officers were there because of complaints of gambling and drug activity at the store. Upon seeing the officers, Oscar Mitchell, who had been in the group, began to walk away. Mitchell was wearing a black leather jacket which was zipped to the neck. The court found that Mitchell's dress despite the warm weather, his failure to acknowledge the officer's orders to stop, and the fact that he was leaving a group in a gambling posture (some kneeling and some standing in a tight group) gave the officers rea-

sonable suspicion of criminal activity. At this point, the officers began a pat-down search for weapons.

"Officer Trader felt a bulge in defendant's left jacket pocket, and he called out to Officer Morgan, 'I got something.'. . . Officer Trader testified that he knew right away that what he felt was not a weapon. Officer Trader asked Morgan to feel Mitchell's left jacket pocket, and Morgan patted down the outer clothing of the pocket. Officer Morgan then asked Mitchell what was in his pocket. Mitchell allegedly gave a deep sigh but refused to answer." 832 F. Supp. at 1075.

The officers eventually reached into the pocket and retrieved a brown paper sack containing a white athletic sock. Inside the sock, the police found six small plastic bags each containing crack cocaine. Mitchell was arrested for possession of crack cocaine. The *Mitchell* court analyzed the facts of the case under *Terry* and *Dickerson*. Although the court found that the facts justified the officers' search of Mitchell, the court concluded that the search exceeded *Terry's* limitations. Significantly, the officers testified that the cocaine was " 'immediately apparent' " upon feeling the outer pocket of the jacket. 832 F. Supp. at 1078. Although the officers were seasoned veterans, the court found that the officers could not have determined that the substance in Mitchell's pocket was crack cocaine. The court emphasized that the officers' search, after determining that Mitchell was not armed, was unlawful as it exceeded the bounds of a *Terry* search. The court stated:

"[W]hen Officer Trader began the initial patdown of Oscar Mitchell, Mr. Mitchell was in a kneeling position . . . with his hands locked behind his head. After the initial patdown, Officer Trader knew that Mitchell was not carrying a weapon. At that point, the officers were out of the *Terry* zone of danger. In other words, the objectives of a *Terry* search for a weapon had been fulfilled. However, the search was continued when Officer Morgan felt of the area outside of the pocket and when Officer Fulton reached into the pocket to retrieve the paper sack. *After concluding that Mitchell was unarmed, the continuation of the search by the officers transformed the encounter from a weapons search into an evidentiary probe.* As emphasized in *Minnesota v. Dickerson*, . . . such evidentiary searches are of the type that *Terry* expressly refused to authorize." (Emphasis added.) 832 F. Supp. at 1079.

The *Mitchell* court considered all of the facts surrounding the search in determining that the officers' search had exceeded *Terry's* limits. The officers' testimony was not dispositive. Moreover,

the *Mitchell* court did not confine its analysis to whether the officers squeezed or manipulated the bulge in the pocket but found that even an additional pat-down exceeds *Terry's* limited scope once it has been determined that the suspect is not armed.

Similarly, in *United States v. Winter*, 826 F. Supp. 33 (D. Mass. 1993), the court found that a search, ostensibly for weapons, had exceeded *Terry's* limited scope. There, after an initial pat-down, the officer determined that the defendant was not armed. However, the officer conducted a second pat-down and retrieved a bag of money from the defendant's pocket. The court suppressed the evidence and found that

"[the officer's] initial pat frisk of Schiavo's outer garments was sufficient to convince [the officer] that Schiavo was not carrying a weapon, thereby eliminating the sole justification for a further protective search. The aim of [the officer's] further inquiry into the contents of the bulge in Schiavo's jacket, as well as the search of Schiavo's pockets, could not therefore have been the protection of himself and others, but was rather, the discovery and preservation of contraband. . . .

"In sum, [the officer] should have terminated his search as soon as he had ascertained that Schiavo was not carrying any weapons on him, which was immediately after the pat frisk of Schiavo's outer garments." 826 F. Supp. at 37.

The *Winter* court found it significant that the officer testified that one purpose of searching the defendant was to find the serialized currency. 826 F. Supp. at 37. See also *United States v. Taylor*, 997 F.2d 1551, 1554 (D.C. Cir. 1993) (impermissible for officers to conduct second frisk, after establishing that suspect was not armed, to identify object in suspect's pocket); *United States v. Gibson*, 19 F.3d 1449, 1451 (D.C. Cir. 1994) (upholding suppression of evidence where officer could only identify lump as "a hard, flat angular object"); *United States v. Ponce*, 8 F.3d 989, 999 (5th Cir. 1993) (unlawful plain feel seizure where officer felt a little bump in suspect's pants pocket, further fingered the bump, and then determined object was something "squishy"; however, evidence admissible as fruit of consent search); *United States v. Ross*, 827 F. Supp. 711, 719 (S.D. Ala. 1993), *aff'd* 19 F.3d 1446 (11th Cir. 1994) (police officer's discovery of matchbox in defendant's underwear during pat-down did not justify his removal of box and seizure of cocaine in it).

Significantly, some courts have upheld *Terry* searches yielding "plain feel" contraband. See *Dickerson v. United States*, 677 A.2d 509, 513-14 (D.C. 1996) (court upheld search where officer immediately recognized plastic bags concealed in crotch area of defendant's shorts as narcotics); *United States v. Hughes*, 15 F.3d 798, 802 (8th Cir. 1994) (upholding plain feel seizure of crack cocaine where detective testified that his "first impression was that the object was contraband"); *United States v. Rodney*, 956 F.2d at 295, 298 (D.C. Cir. 1992) (after feeling small, rock-like objects in suspect's groin area during frisk search, police officer had probable cause to arrest and could retrieve drugs).

While this court accepts the trial court's findings of fact, this court still determines whether the trial court properly applied the law to those facts. Here, when Ford failed to find any weapons on Wonders after the initial pat-down, Ford's continued pat-down of Wonders' pocket after he determined that it contained no weapon was unrelated to the sole justification for the search under *Terry*. Moreover, Ford asked Wonders what was in the pocket. These facts do not show that Ford immediately knew that the plastic baggies contained marijuana. For the plain feel exception to apply, the object's incriminating character must be immediately recognized.

Furthermore, at the preliminary hearing and during the suppression hearing, Ford testified that once he found drug paraphernalia in Garcia's car, he patted down the occupants of the car not only for weapons but also for additional drugs or paraphernalia. As stated earlier, *Terry* permits a limited protective search for weapons but does not allow a general exploratory search for evidence of criminal activity. Based on these facts, Ford exceeded the permissible limits for a *Terry* search.

Another factor that we have not discussed is Ford's lack of formal training in drug detection. Ford admitted that he did not have any formal academy training in drug detection. Ford's experience was the result of continuing education, the D.A.R.E. program, and 6 years of routine patrol. D.A.R.E. is a drug prevention program designed to teach school children the dangers of drugs in an attempt to curtail drug use at an early age. Ford's D.A.R.E. training

experience consisted of the instructor showing the class what some drugs and drug paraphernalia looked like.

Moreover, Ford testified that he could not describe what a baggie of marijuana felt like. Consequently, to Ford, the marijuana baggies had no distinctive feel. In *United States v. Pace,* 709 F. Supp. 948, 955 (C.D. Cal. 1989), *aff'd* 893 F.2d 1103 (9th Cir. 1990), the court explained that the sense of touch is as reliable as the sense of sight: "When objects have a distinctive and consistent feel and shape that an officer has been trained to detect and has previous experience in detecting, then touching these objects provides the officer with the same recognition his sight would have produced." But as we stated earlier, Ford was unable to describe what a baggie of marijuana felt like, and we have previously discussed Ford's lack of formal training in drug detection.

In stating that the plain feel doctrine can be abused, the court in *Dickerson v. United States* warned: "We recognize that this plain-feel doctrine can be abused. Trial courts must be careful to assure that a police officer's 'immediately apparent' recognition of a concealed drug package . . . is not too casually claimed or accepted." 677 A.2d at 512.

For the above reasons, Ford's seizure of the baggies of marijuana was unconstitutional and should be suppressed. Likewise, the cocaine that was seized during a later inventory search must be suppressed as " 'fruit of the poisonous tree.' " *Wong Sun v. United States,* 371 U.S. 471, 488, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

Reversed.