# IN THE SUPREME COURT OF IOWA

No. 20–1595

Submitted March 23, 2022—Filed May 20, 2022

**STATE OF IOWA,**

      Appellant,

vs.

**EARNEST JONES HUNT JR.,**

      Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

Defendant seeks further review of court of appeals decision that reversed a district court ruling granting his motion to suppress evidence obtained during a pat-down search for weapons. **COURT OF APPEALS DECISION AFFIRMED; DISTRICT COURT SUPPRESSION RULING REVERSED AND CASE REMANDED.**

McDermott, J., delivered the opinion of the court in which Christensen, C.J., and Waterman, Mansfield, McDonald, and Oxley, JJ., joined. Appel, J., filed a dissent.

Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney General, for appellant.

Martha J. Lucey, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellee.

**McDERMOTT, Justice.**

May a police officer seize a concealed package from someone's pocket during a pat-down for weapons if the officer determines—through the officer's sense of touch—that the packaging is consistent with drugs of some sort, but the officer can't determine the precise *type* of drugs in the packaging? This case presents this court's first review of a district court decision addressing what has become known as the "plain feel" doctrine. The district court held that the officer's confessed inability to discern the type of drugs in the packaging before removing them from the person's pocket—and thus an inability to discern whether the substances were even drugs at all—required suppressing the evidence. The court of appeals reversed. We granted the defendant's application for further review.

## I.

Earnest Hunt, Jr. was a "person of interest" in the investigation of a shooting in Dubuque. The day after the shooting, Officer Chad Leitzen saw Hunt riding in the passenger seat of a Chevy Impala moving through downtown Dubuque. Following the Impala in an unmarked car, Leitzen saw the Impala make a left turn without signaling and stopped it. He approached the Impala on the passenger (Hunt's) side with his gun drawn but not trained on Hunt. Leitzen directed Hunt to place his hands on the dashboard and began asking questions. While responding, Hunt removed his hands from the dashboard, prompting Leitzen to command Hunt to keep his hands on the dash. Leitzen described Hunt

as acting "extremely nervous," speaking quickly, and asking several times whether he was under arrest.

When Hunt again removed his hands from the dash without permission, Leitzen told Hunt to get out of the car and that he was being detained in handcuffs because his behavior was making Leitzen nervous. Leitzen asked Hunt for permission to search him. Hunt refused. Leitzen then told Hunt that Leitzen would pat him down for weapons.

While patting Hunt down, Leitzen (according to his later testimony) "immediately felt small plastic or small hardballs, packaged balls which were inside of a plastic bag" in Hunt's sweatshirt pocket. Leitzen said that he could "hear the crunch of the plastic bag" and could feel the plastic bag and the individual hard packages inside the bag. The small individual packages he felt in Hunt's pocket were, according to Leitzen, "invariably how cocaine, crack cocaine, or heroin are packaged for sale in Dubuque." Leitzen testified that it was "immediately apparent" that the objects were illegal drugs and that he didn't manipulate or squeeze the package within Hunt's pocket to determine what it was. Leitzen removed the drugs from Hunt's pocket. In looking at the packages, Leitzen believed that they contained drugs, but he still couldn't discern what type. He told Hunt, "Now you're being arrested for the drugs," and placed Hunt under arrest.

Leitzen admitted that he couldn't specifically identify the type of drugs in the packaging based on the pat-down. The packaging led him to believe it was heroin, powder cocaine, or crack cocaine, but he couldn't determine for sure

which one. After he removed the bags from Hunt's pocket, Leitzen manipulated the bags to try to figure out what the substance was. Bodycam recordings from the scene show Leitzen touching and looking at the small bags trying to determine the substance. He stated that "one of the bags felt like it was very squared off," which was inconsistent with the usual feel of crack cocaine.

Hunt was charged with possession with intent to manufacture or deliver forty grams or less of cocaine base—commonly known as "crack"—under Iowa Code section 124.401(1)(*c*)(3) (2019). He moved to suppress the evidence of the drugs, arguing that the police seized the drugs in violation of his rights under the Fourth Amendment to the U.S. Constitution and article I, section 8 of the Iowa Constitution.

At the suppression hearing, Leitzen testified that he'd worked as a police officer for eighteen years, and for seven of those years worked in a drug task force. He testified based on his experience that in Dubuque, "powder cocaine, crack cocaine, and heroin are packaged in the corner of sandwich baggies, just twisted into a knot and tied into small circulars from the corner of a plastic bag." By comparison, he testified that in Dubuque, "almost without exception, methamphetamine is packaged in small Ziploc-type gem baggies" and that "marijuana can be packaged in numerous ways." Leitzen described the different textures of powder and crack cocaine, with powder cocaine having (unsurprisingly) a powder texture and crack cocaine having a more crystallized or rock-like texture.

The district court suppressed the evidence, finding that "[t]he State has not met its burden of showing that there was probable cause to believe that Defendant had drugs in his pocket." The district court elaborated that the item in Hunt's pocket "could have been anything." The court reasoned that "Leitzen's testimony that he knew it was drugs lacked sufficient explanation as to how and why he knew that to be true," particularly since "Leitzen was not sure of the nature of the substance in the bags *even after* he had removed them and was examining them by feel and sight."

The State applied for discretionary appellate review. Our court granted the application for discretionary review, stayed the district court proceedings, and transferred the case to the court of appeals. The court of appeals reversed the district court's suppression ruling, determining it sufficient under the plain-feel exception to the warrant requirement that Leitzen believed the package contained heroin, powder cocaine, or crack cocaine despite not knowing which one, and remanded the case. We granted Hunt's application for further review.

II.

Because Hunt's motion to suppress asserts a violation of his constitutional rights, our review is de novo, which means that we will independently evaluate the record in the case. *State v. Hillery*, 956 N.W.2d 492, 498 (Iowa 2021). "We give deference to the district court's fact findings because of that court's ability to assess the credibility of the witnesses," but "we are not bound by those findings." *State v. Carter*, 696 N.W.2d 31, 36 (Iowa 2005).

Both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution grant people a right of protection against unreasonable searches and seizures of "their persons, houses, papers, and effects." U.S. Const. amend. IV; Iowa Const. art. I, § 8. The Fourth Amendment's protections apply to the states based on the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 761 (2010). These rights safeguard people against warrantless searches and seizures by the government, with carefully drawn exceptions.

In *Terry v. Ohio*, the Supreme Court held that a law enforcement officer may pat-down a suspect without violating the Fourth Amendment's prohibition against unreasonable searches if the officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." 392 U.S. 1, 27 (1968). The officer must provide "specific reasonable inferences" to justify the pat-down; a "hunch" isn't enough. *Id.*

Hunt doesn't contest the basis for the traffic stop, nor does he contest Leitzin's ability to perform the pat-down after the stop. Hunt makes no claim, in other words, that Leitzen violated his constitutional rights in frisking him for weapons. Hunt argues instead that Leitzen exceeded the lawful scope of that frisk when he seized the package—which Leitzen knew wasn't a weapon—from Hunt's pocket.

In *Minnesota v. Dickerson*, the Supreme Court articulated an exception to the warrant requirement based on an officer's "plain feel" of contraband during

a lawful frisk for weapons. 508 U.S. 366, 375 (1993). In *Dickerson*, officers were on patrol near a "crack house" when a man spotted the police car and abruptly began walking in the other direction. *Id.* at 368–69. The officers, suspicions now aroused, stopped the man to investigate. *Id.* at 369. One of the officers patted the man down for weapons. *Id.* Although he found no weapons, the officer testified to feeling "a small lump" in the defendant's pocket. *Id.* He examined the lump with his fingers and concluded it was crack cocaine packaged in cellophane. *Id.* The officer reached into the man's pocket and removed the package, which indeed turned out to contain a lump of crack. *Id.*

The man moved to suppress the evidence of the seizure, arguing that it violated his Fourth Amendment rights. *Id.* The Court compared the seizure of the package of crack, which was rooted in the officer's sense of touch, to lawful seizures rooted in a different sense: the "plain view" doctrine. *Id.* at 374–75. The plain-view doctrine is an exception to the Fourth Amendment's warrant requirement that allows officers to seize contraband when an officer sees the contraband in plain view, is lawfully present when they observe it, and has a lawful right to access it. *Arizona v. Hicks*, 480 U.S. 321, 325–26 (1987); *Michigan v. Long*, 463 U.S. 1032, 1050 (1983).

The Court articulated the plain-feel justification to seize property during a frisk for weapons this way:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity *immediately apparent*, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would

> be justified by the same practical considerations that inhere in the plain-view context.

*Dickerson*, 508 U.S. at 375–76 (emphasis added). The Court rejected arguments that touch is less reliable or more invasive than sight, noting the Court in *Terry* had already determined that a pat-down could reliably detect weapons and that officers could use their sense of touch for that search. *Id.* at 376–77. Regardless of the means of perception (sight, touch, or otherwise), the Fourth Amendment in all cases requires that "the officer have probable cause to believe that the item is contraband before seizing it." *Id.*

But when the Supreme Court actually applied the plain-feel doctrine to the facts presented, it found that the officer didn't meet the plain-feel exception because the officer determined the lump was contraband only after "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket." *Id.* at 378 (quoting *State v. Dickerson*, 481 N.W.2d 840, 844 (Minn. 1992)). And since by that point the officer knew that the lump wasn't a weapon, and wasn't sure that it was contraband without further manipulation, the officer exceeded the scope of the *Terry* pat-down with his "continued exploration" of the pocket's contents. *Id.*

Neither party argues that we should apply a plain-feel standard under the Iowa Constitution that differs from the standard applied under the Federal Constitution in *Dickerson*. Hunt argues that Leitzen's search failed to satisfy the requirements of the plain-feel doctrine because it wasn't "readily apparent" to Leitzen that the package in Hunt's pocket contained contraband. If an officer believes an item in a pocket could be one of three different things, Hunt urges,

then the officer has no basis to say the item's identity is *apparent*—let alone readily so—to justify the officer's seizure under the plain-feel doctrine. The district court agreed and suppressed the evidence.

The State argues that Leitzen's testimony establishes that the item's packaging made its identity as contraband "readily apparent," and thus its seizure met the requirements of the plain-feel doctrine. Even if Leitzen couldn't articulate the precise drug in the packaging, the State argues, he didn't have to know *exactly* what was in the bags; it was enough that Leitzen resolutely concluded that the bag he felt in Hunt's pocket contained illegal drugs.

And more broadly, the State argues that probable cause existed for the seizure under any rendering of the facts here. The plain-feel exception, the State urges, doesn't put in place some heightened probable-cause standard to permit an officer to seize contraband. An officer has probable cause to investigate when "a person of reasonable prudence would believe a crime has been committed or that evidence of a crime might be located in the particular area to be searched." *State v. Naujoks*, 637 N.W.2d 101, 108 (Iowa 2001); *see* 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.2(b), at 44–45 (6th ed. 2020) [hereinafter LaFave].

The district court and court of appeals focused heavily on *Dickerson*'s "immediately apparent" language, analyzing whether Leitzen needed to know the *exact* illegal drug in the package or whether it was enough that the package contained *some* illegal drug. But there's a broader principle that *Dickerson* suggests, and one that we think better clarifies the test for determining whether

a seizure of contraband comports with the constitution's search-and-seizure protections.

If an officer develops probable cause during a pat-down to believe that a person possesses contraband and thus is committing a crime, then the officer may lawfully arrest the person. *See State v. Stevens*, 970 N.W.2d 598, 604 (Iowa 2022). And if an officer may lawfully arrest a person, then the officer may perform a warrantless search incident to that arrest. *Id.*; *see* 1 LaFave § 2.2(a), at 635–36. The search incident to arrest would, in turn, justify the warrantless seizure of the contraband. *Stevens*, 970 N.W.2d at 604 (citing *United States v. Robinson*, 414 U.S. 218, 234 (1973)). "Even though a search incident to arrest typically occurs after an arrest, 'the timing of the formal arrest is not fatal to the search.' " *Id.* (quoting *State v. Horton*, 625 N.W.2d 362, 364 (Iowa 2001) (en banc)).

An officer can develop probable cause that a crime has been committed at any time—including while frisking a person for weapons. *See State v. McGee*, 381 N.W.2d 630, 632 (Iowa 1986). And this is where the standard for probable cause becomes important. "[P]robable cause does not require absolute certainty, but a probable determination through the eye of a reasonably prudent person." *State v. Prior*, 617 N.W.2d 260, 268 (Iowa 2000) (en banc). The phrase "immediately apparent" in *Dickerson* is logically read to refer to facts sufficient to establish probable cause, not to establish certainty in the officer's mind. *See* 2 LaFave § 4.11(d), at 1013–15.

The facts of this case indicate that Leitzen, while conducting a lawful *Terry* frisk for weapons, determined based on his experience that the objects he felt in Hunt's pocket were packaged drugs, specifically either powder cocaine, crack cocaine, or heroin. Unlike in *Dickerson*, the record in this case contains no evidence to suggest that Leitzen extended the pat-down or explored Hunt's pocket further than permitted to discover if Hunt was armed. This determination that Hunt at that moment possessed illegal drugs, if founded, would establish probable cause for Hunt's arrest and seizure of the drugs after a search incident to his arrest.

A question nonetheless remains about whether Leitzen's level of knowledge gained by touching the packaging, without certainty of the contents inside the packaging, was enough to generate probable cause to arrest Hunt. Leitzen didn't actually testify to feeling any drugs (for example, a powdery substance or rock-like objects) in Hunt's pocket. We must decide whether Leitzen's conclusion that Hunt possessed drugs in fact meets the bar to establish probable cause.

We hold that it does. Again, Leitzen worked as a police officer for eighteen years, and for seven of those years worked in a drug task force. He testified based on his experience that in Dubuque, "powder cocaine, crack cocaine, and heroin are packaged in the corner of sandwich baggies, just twisted into a knot and tied into small circulars from the corner of a plastic bag." Letizen's testimony describing, in his experience, how these particular drugs are uniquely packed into bags of a particular size and shape, with a particular means of fastening, lends credence to his assertion of having identified the packages as likely to

contain one of the three drugs packaged in this way. Leitzen was also able to rule out other types of drugs solely based on the packaging because the packaging of the drugs was not similar to that of methamphetamine or marijuana. The evidence, on the record before us, would establish probable cause for Leitzen to have arrested Hunt for drug possession. *See United States v. Proctor*, 148 F.3d 39, 42–43 (1st Cir. 1998) (finding an officer who "made an immediate determination that the bulge was in fact a glassine bag containing marijuana" could seize the object); *Doctor v. State*, 596 So. 2d 442, 445 (Fla. 1992) (during lawful frisk, officer was able by virtue of his particularized experience to determine defendant carrying crack cocaine by "the texture of the plastic bag that it's in, the little rock formations of it"); *People v. Custer*, 630 N.W.2d 870, 879 (Mich. 2001) ("[W]hile conducting the patdown search of defendant, the officer felt a two-by-three-inch object in defendant's pocket that he believed was a card of blotter acid . . . based on his knowledge that blotter acid was often contained on sheets of cardboard . . . . Under these circumstances, the officer had probable cause to believe that the object he felt in defendant's pocket was contraband."); *State v. Bradley*, 867 So. 2d 31 (La. App. 2004) (finding it sufficient that the officer felt a bulge in the defendant's pocket that "in his opinion felt like plastic bags such as are used for drug packaging") *State v. Ochoa*, 93 P.3d 1286, 1290 (N.M. 2004) ("An officer's experience and training, considered within the context of the incident, may permit the officer to identify drug paraphernalia or drug packaging with a reasonable level of probability, sufficient for probable cause."); *Commonwealth v. Parker*, 957 A.2d 311, 316 (Pa.

Super. Ct. 2008) ("[T]he officer here was able to immediately identify the object he felt as packaged crack cocaine before he reached into Parker's pocket and looked at the plastic bags."); *Maestas v. State*, 416 P.3d 777, 782 (Wyo. 2018) ("Corporal Halter's testimony indicates that he felt and immediately believed the rock-like object was contraband. At that moment, Corporal Halter had probable cause to seize the object.").

Again, the bar for probable cause is not absolute certainty, but rather whether "a person of reasonable prudence would believe a crime has been committed or that evidence of a crime might be located in the particular area to be searched." *Naujoks*, 637 N.W.2d at 108. *See generally* 2 LaFave § 3.2(c), at 58–59 (stating that probable cause "is to be viewed from the vantage point of a prudent, reasonable, cautious police officer . . . guided by his experience and training" (quoting *United States v. Davis*, 458 F.2d 819, 821 (D.C. Cir. 1972) (per curiam) (omission in original))).

Our holding today neither stiffens nor dilutes the probable cause standard that applies to law enforcement's encounters with people. We simply apply it to a factual scenario in which a police officer, while conducting what the defendant concedes is a lawful frisk for weapons, establishes probable cause through touch to believe that the defendant has committed a crime (in this case, possession of illegal drugs). For purposes of establishing probable cause, there's no meaningful difference between Leitzen *seeing* Hunt place a package in his pocket with these physical characteristics and Leitzen *feeling* a package with these same physical characteristics while frisking for weapons.

Probable cause isn't limited to any particular method of perception. We've previously held that an officer can develop probable cause based on smell. *State v. Watts*, 801 N.W.2d 845, 854 (Iowa 2011) (holding "that a trained officer's detection of a sufficiently distinctive odor, by itself or when accompanied by other facts, may establish probable cause"). And we can surmise no good reason that officers should be rendered unable to act on probable cause that develops during the course of a lawful pat-down based on the officer's sense of touch when the officer is otherwise able to act on probable cause that develops during the course of a lawful pat-down based on the officer's seeing something, smelling something, or hearing something. Probable cause based on tactile identification may be just as compelling as probable cause drawn from visual, aural, or olfactory identification.

For these reasons, we thus reverse the district court's grant of Hunt's motion to suppress and remand for further proceedings.

**COURT OF APPEALS DECISION AFFIRMED; DISTRICT COURT SUPPRESSION RULING REVERSED AND CASE REMANDED.**

Christensen, C.J., and Waterman, Mansfield, McDonald, and Oxley, JJ., join this opinion. Appel, J., files a dissenting opinion.

**APPEL, Justice (dissenting).**

This case involves a double-barreled risk of unconstitutional invasion of privacy arising from a warrantless pretextual stop for a minor traffic violation permitted under *Whren v. United States*, 517 U.S. 806 (1996), followed by a warrantless search for weapons based not on probable cause but diluted reasonable suspicion under the sprawling doctrine of *Terry v. Ohio*, 392 U.S. 1 (1968). The combination of these troublesome doctrines causes me to examine closely the underlying legal doctrine and its application to the facts of this case. *See State v. Warren*, 955 N.W.2d 848, 873–76 (Iowa 2021) (Appel, J., dissenting) (citing interplay of Supreme Court doctrines in search and seizure).

As is always the case, the constitutional analysis is not about "correct" and "incorrect" decisions but about choices made and roads not taken. And, where exceptions to the warrant requirement are involved, there is always the problem of mission creep, where supposedly narrow exceptions to the warrant requirement (like *Terry*-type stops) end up being robust in practice.

Finally, I approach the question of the warrantless stop and warrantless search in this case with a recognition that exceptions to the warrant requirement must be tightly contained and that every expansion of government power to search and seize leads to a corresponding reduction in personal liberty. *See, e.g.*, *State v. Price-Williams*, ___ N.W.2d ___, ___, 2022 WL 1194018, at *7–28 (Iowa Apr. 22, 2022) (Appel, J., dissenting) (arguing that a valid stop does not mean that a frisk is necessarily permitted; there must be a reasonable suspicion that

the individual is armed and dangerous); *State v. Hauge*, ___ N.W.2d ___, ___, 2022 WL 1193721, at *12–43 (Iowa Apr. 22, 2022) (Appel, J., dissenting) (arguing for use of waiver doctrine in consent searches).

**I. Historical Overview of "Plain Touch" Doctrine.**

**A. From *Terry v. Ohio* to *Minnesota v. Dickerson.*** The United States Supreme Court adopted the notion of a warrantless pat-down search for weapons in the controversial case of *Terry v. Ohio.* 392 U.S. at 30–31. In *Terry*, the Supreme Court emphasized that it was authorizing only "narrowly drawn authority" to engage in a search for weapons. *Id.* The pat-down search was to be a "carefully limited search of the outer clothing of [the suspect] in an attempt to discover weapons." *Id.* at 30.

After *Terry*, the Supreme Court adopted the "plain view" doctrine in *Coolidge v. New Hampshire*, 403 U.S. 443, 465–67 (1971). According to the *Coolidge* plurality, the police were permitted to engage in a warrantless search if (1) the object is in plain view, (2) its discovery was inadvertent, and (3) it was "immediately apparent" that the items may be evidence of a crime, such as contraband. 403 U.S. at 466–73. The plurality in *Coolidge* emphasized, as the Supreme Court often does when crafting yet another exception to the warrant requirement, the narrowness of the holding. Specifically, the plurality stated that "[t]he 'pla[i]n view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Id.* at 466.

A few years later, however, the Supreme Court abandoned the inadvertence requirement in *Horton v. California*, 496 U.S. 128, 137 (1990), thereby eliminating one of the protections against pretextual searches. In *Arizona v. Hicks*, the Supreme Court addressed the meaning of the term "immediately apparent" as used in *Coolidge*. 480 U.S. 321, 326–27 (1987). The *Hicks* Court held that "immediately apparent" meant only that probable cause must be present, not the higher degree of certitude that some appellate courts were embracing. *Id.* at 326. Thus, what may have been a narrow exception to the warrant requirement was expanding beyond its original confines.

Using *Coolidge* and *Terry* as a springboard, a number of federal courts expanded the exception to the warrant requirement yet again to include circumstances where a police officer engaged in a *Terry*-type search determines that a person is carrying contraband based on the "plain feel" of the object. *See, e.g., United States v. Roach*, 477 F. App'x 993, 998–99 (4th Cir. 2012) (per curiam); *United States v. Yamba*, 506 F.3d 251, 256–60 (3d Cir. 2007); *United States v. Rivers*, 121 F.3d 1043, 1046–47 (7th Cir. 1997); *United States v. Russell*, 670 F.2d 323, 325 (D.C. Cir. 1982); *United States v. Ocampo*, 650 F.2d 421, 427–29 (2d Cir. 1981).

There was, however, an important distinction in the caselaw worth our discussion. In *United States v. Williams*, the United States Court of Appeals, District of Columbia Circuit adopted a variant of plain feel that insisted that the police officer have a "reasonable certainty" of the presence of contraband. 822 F.2d 1174, 1184 (D.C. Cir. 1987). The reasonable certainty standard was a

higher standard than probable cause and, according to the *Williams* Court, was justified based upon the differences between the plain-view and plain-feel doctrines. *Id.* at 1184–85. Similarly, in *United States v. Ocampo*, the Second Circuit applied a seemly-higher-than-probable-cause standard in applying the newly minted exception. *See* 650 F.2d at 429 (noting that the agent was "able readily to identify [the] contents as wrapped currency simply by feeling the outside of the [paper] bag" and concluding that "[w]here the contents of a container are easily discernible by frisking the exterior of a package, there is little likelihood that the owner could reasonably expect any substantial degree of privacy").

Several state courts chose a different interpretation of the Fourth Amendment in the context of the evolving plain-feel doctrine prior to *Minnesota v. Dickerson*, 508 U.S. 366 (1993). State courts in Arizona, Illinois, and Pennsylvania chose to reject the plain-feel doctrine largely because they sought to enforce strict limitations of *Terry* and because the plain-feel doctrine was thought to be too intrusive to withstand Fourth Amendment muster. *See State v. Collins*, 679 P.2d 80, 81–84 (Ariz. Ct. App. 1983); *People v. McCarty*, 296 N.E.2d 862, 863 (Ill. App. Ct. 1973) (per curiam); *Commonwealth v. Marconi*, 597 A.2d 616, 619 (Pa. Super. Ct. 1991); *State v. Broadnax*, 654 P.2d 96, 101–03 (Wash. 1982) (en banc).

In a case decided just before the Supreme Court decided *Dickerson*, the New York Court of Appeals rejected the plain-feel doctrine under both the United States and New York Constitutions in *People v. Diaz*, 612 N.E.2d 298, 299 (N.Y.

1993). The *Diaz* court distinguished the plain-view doctrine from the plain-feel doctrine in several ways. First, under the plain-view doctrine, no search occurs. *Id.* at 301–02. Further, because the objects are out in the open, there is no expectation of privacy. *Id.* at 302. But, according to the *Diaz* court, these features of plain view do not extend to plain-feel cases. *Id.* A concealed item cannot be identified except by further search, and the person who has the item concealed in their clothing has an expectation of privacy in its contents. *Id.* Additionally, the *Diaz* court noted the inherently unreliable nature of touch compared with sight. *Id.* ("While in most instances seeing an object will instantly reveal its identity and nature, touching is inherently less reliable and cannot conclusively establish an object's identity or criminal nature."). The *Diaz* court recognized that plain feel would often be based upon a police officer's testimony, but that identification of a concealed item would ordinarily require "a degree of pinching, squeezing or probing" beyond the limited intrusion permitted under *Terry*. *Id.* (cautioning additionally that to allow the plain-feel exception would risk "blurring of the limits to *Terry* searches").

The Supreme Court of Minnesota took a similar view to *Diaz* in *State v. Dickerson*, 481 N.W.2d 840 (Minn. 1992). In *Dickerson*, the court considered a case where a police officer conducting a *Terry* pat-down concluded the suspect was carrying contraband after he examined a lump he felt with his fingers to be crack cocaine. *Id.* at 842–43. The court refused to extend the plain-view doctrine to a situation involving a plain feel for two reasons. *Id.* at 845. First, the court noted that the senses of touch and sight are not equivalent as the sense of touch

is less immediate and reliable than sight. *Id.* Further, the court noted that touching involves a greater invasion of privacy than plain-view situations. *Id.* As a result, the court held that the evidence of the search must be suppressed under the Fourth Amendment. *Id.*

After *Dickerson,* a few courts have interpreted the phrase "immediately apparent" as requiring a showing of some certainty as suggested in the pre-*Dickerson* case of *Williams.* For example, in *Mason v. State,* the Georgia appellate court stated that under the plain-feel doctrine, the officer must express a degree of certainty in identifying the item because the search is being conducted solely for the safety of the police officer and others nearby, not to procure evidence. 647 S.E.2d 308, 309 (Ga. Ct. App. 2007); *see also United States v. Ross*, 827 F. Supp. 711, 719 (S.D. Ala. 1993); *United States v. Winter*, 826 F. Supp. 33, 37 (D. Mass. 1993); *State v. Parker*, 622 So. 2d 791, 795 (La. Ct. App. 1993); *People v. Champion*, 549 N.W.2d 849, 861–62 (Mich. 1996) (near certainty required for the plain-feel doctrine); *Commonwealth v. Stevenson*, 744 A.2d 1261, 1267 (Pa. 2000); *State v. Bridges*, 963 S.W.2d 487, 495 (Tenn. 1997) (per curiam). Other state courts, however, have rejected this approach. *See, e.g., State v. Wonders*, 952 P.2d 1351, 1362 (Kan. 1998).

**B. The United States Supreme Court's Choice in *Minnesota v. Dickerson.*** The United States Supreme Court granted certiorari in *Minnesota v. Dickerson* to consider whether the Minnesota Supreme Court properly rejected the plain-feel doctrine. 508 U.S. at 368. In *Dickerson,* the Supreme Court unanimously held in a short opinion that the principles of the established plain-

view doctrine extended by analogy to cases involving plain feel when police officers engage in a *Terry* search. *Id.* at 374–76. According to Justice White, if a police officer uncovers contraband during a *Terry* search, there is no further invasion of privacy when the police officer seizes that item. *Id.* at 375–76. The majority of the Court, however, concluded that the unlawful nature of the contraband at issue in *Dickerson* was not "immediately apparent" because the police officers engaged in "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket" in a fashion not authorized by a *Terry* search. *Id.* at 378–79 (quoting *Dickerson*, 481 N.W.2d at 844). In an interesting concurrence, joined by Chief Justice Rehnquist, Justice Scalia questioned the validity of *Terry* itself. *Id.* at 379–83 (Scalia, J., concurring).

Some academic commentary was critical of *Dickerson. See, e.g.,* George M. Dery III, *The Uncertain Reach of the Plain Touch Doctrine: An examination of* Minnesota v. Dickerson *and its Impact on Current Fourth Amendment Law and Daily Police Practice*, 21 Am. J. Crim. L. 385, 394–404 (1994) (criticizing the plain-feel doctrine because it fails to recognize the difference between the sense of sight and touch, and could encourage pretextual searches); Anne Bowen Poulin, *The Plain Feel Doctrine and the Evolution of the Fourth Amendment*, 42 Vill. L. Rev. 741, 755 (1997) [hereinafter Poulin] (pointing out *Dickerson* may tempt police to exploit any opportunity to search more broadly and to probe more aggressively).

In my view, *Dickerson* has a number of problems. First, the immediately apparent standard, even as potentially modified by *Hicks*, seems subjective in

nature. Determining what a police officer knew and when they knew it is a slippery slope and not subject to effective cross-examination. As a result, deferential application of the immediately apparent test will permit retrospective "magic words" to sustain a search when a police officer provides scripted testimony that declares expertise in drug matters and asserts that to the police officer, it was immediately apparent the concealed substance was contraband. *Jones v. State*, 682 A.2d 248, 256 (Md. 1996). In addition, because the item is necessarily hidden from view, the ability of a police officer to determine what the substance is with accuracy is necessarily highly speculative and not nearly as reliable as evidence subject to visual examination. And, unlike the plain-view doctrine, the plain-feel doctrine provides a basis for an intrusive seizure of evidence on the body of a suspect, a highly intrusive act compared to the seizure of objects in plain view. Finally, the plain-touch doctrine could encourage routine pretextual searches where the stop and the subsequent weapons search is primarily designed as a warrantless search for contraband rather than a stop designed to promote public safety and protect police officers from the threat of weapons. In my view, it is of critical importance that if it is to be adopted at all, the plain-feel warrantless seizure should be permitted only in narrow, well-defined circumstances.

**C. "Plain Feel" Caselaw after *Dickerson*.** The federal caselaw, of course, follows *Dickerson.* The main issue in the federal cases is whether the standard for further search of a person based on plain feel is "probable cause" or the higher standard of "immediately" apparent utilized by the D.C. Circuit in the pre-

*Dickerson* case of *Williams*. This possibility, however, was largely undercut by *Hicks*, where the United States Supreme Court found that probable cause was the standard under the plain-view doctrine, which, by analogy, might also apply to plain-feel cases.

In the state courts, *Dickerson* has generally been adopted as a plain-feel exception to the warrant requirement. *See, e.g., State v. Trine*, 673 A.2d 1098, 1107 (Conn. 1996); *People v. Mitchell*, 650 N.E.2d 1014, 1023 (Ill. 1995); *Champion*, 549 N.W.2d at 856. Some of the state cases, however, adhere strictly to the requirement that the nature of the contraband must be immediately apparent. For example, in *Murphy v. Commonwealth*, the Virginia Supreme Court held that a police officer's detection of a plastic baggie during a pat-down was not sufficient to justify a seizure of the baggie because its unlawful nature was not immediately apparent. 570 S.E.2d 836, 839–40 (Vir. 2002); *see also Ex parte Warren*, 783 So. 2d 86, 94–95 (Ala. 2000); *Commonwealth v. Stevenson*, 744 A.2d at 1268; *State v. Parker*, 622 So. 2d 791, 795 (La. Ct. App. 1993).

In these cases, "immediately apparent" means something beyond probable cause and approaching certitude. The heightened standard is imposed because of the need to ensure the narrow confines of *Terry* searches and to prevent searches for weapons from routinely morphing into searches for drugs.

**D. Caselaw Involving Drugs and Baggies.** It is a surprise to no one that the plain-feel doctrine has become an important tool for law enforcement in drug investigations. Indeed, the police officers involved in this case were on duty as part of a drug enforcement unit. It is not surprising that there are a number of

plain-feel cases involving *Terry*-type searches revealing baggies underneath the clothing of the person being searched. The caselaw is diverse in part because the cases are fact-specific.

In *Commonwealth v. Stackfield,* the Pennsylvania Supreme Court considered whether the discovery of contraband during a *Terry*-type search was valid under the plain-feel doctrine. 651 A.2d 558, 561 (Pa. Super. Ct. 1994). The court concluded that the facts did not establish that the police officer immediately recognized the presence of contraband while conducting the *Terry* search. *Id.* at 562. According to the *Stackfield* court:

> A zip-lock baggie is not per se contraband, although material contained in a zip-lock baggie may well be. . . . The record supports a factual finding that the officer felt a mass that he recognized as a baggie; it does not support a factual finding that the officer felt what he immediately recognized as contraband. Sight unseen, the contents of the baggies that the officer felt in appellant's pants pockets could as easily have contained the remains of appellant's lunch as contraband.

*Id.*

The fact that the material could be an illegal substance and that the police officer had observed illegal substances being carried in baggies was insufficient. As stated in *Stackfield,* to hold otherwise would be to ignore *Dickerson*'s mandate that the plain-feel doctrine is a narrow exception to the warrant requirement that only applies when an officer conducting a lawful *Terry* frisk feels an object and the object's mass or contour makes its identity as contraband immediately apparent. *Id.* Note the Pennsylvania Supreme Court's emphasis on the narrowness of the doctrine.

In *G.M. v. State*, the police officer conducting a pat-down of the defendant felt a bag inside the defendant's pocket that he believed to have a plant-like material within the bag. 172 So. 3d 963, 964 (Fl. Dist. Ct. App. 2015). The police officer testified that based on his training and experience, he thought it was marijuana within the bag and pulled it out of the defendant's pocket. *Id.* at 965. The court held the police officer did not know what kind of plant was in the bag— the officer simply claimed that based on his training and experience that it was marijuana. *Id.* at 968. The court found the officer had nothing more than an "inkling" that the plant within the baggie could have been marijuana. *Id.* The officer's perception that there was contraband in the defendant's pocket was not a result of his "tactile perception" but an educated guess based on the plain feel of the object. *Id.* This did not meet the immediate apparent requirement. *Id.*

Another instructive baggie case is *State v. Garvin,* 207 P.3d 1266 (Wash. 2009) (en banc). In *Garvin,* the police officer conducting a *Terry* frisk felt a plastic baggie in the pocket of the defendant. *Id.* at 1268. Without removing the bag, the officer squeezed the bag and felt something more within. *Id.* at 1269. The police officer then recognized the item as something used by drug users and removed the baggie. *Id.* at 1268–69. The *Garvin* court held that the actions of the police officer exceeded that permitted by *Dickerson* and held that the evidence should have been suppressed. *Id.* at 1272.

In *Garvin,* the officer admitted the common-sense notion that it was necessary to squeeze a baggie in order to determine its contents. While the existence of the baggie may have been immediately apparent, the determination

of the contents crossed the line from a permitted *Terry*-type frisk into an impermissible plain-feel search.

In *Murphy*, the Virginia Supreme Court considered whether a police officer's seizure of a plastic baggie containing drugs was permitted under the plain-feel doctrine where the police officer felt a plastic baggie and testified that he knew from training and experience that the plastic bag contained drugs. 570 S.E.2d at 837. Consistent with *Garvin*, the *Murphy* court held that the plain-view doctrine was not satisfied on such a minimal showing. *Id.* at 840.

Another case of interest is *State v. Hudson*, 874 P.2d 160, 166 (Wash. 1994). In *Hudson*, the police officer testified that when he reached into the defendant's pocket to touch a baggie, he believed he felt "a one ounce size piece of cocaine broken off a kilo size." *Id.* The *Hudson* court remanded the case for further fact-finding, noting that "the detective described the substance in the baggie with a particularity arguably unattainable without extensive manipulation." *Id.* That was exactly the point made in *Garvin*. *Garvin* and *Hudson* stand for the proposition that the greater the detail obtained by police officers of the physical characteristics of the hidden material, the greater the likelihood that the action of the police officer exceeded the limited pat-down permitted by *Terry*. *See* Poulin, 42 Vill. L. Rev. at 787–88 (asserting that *Garvin* and *Hudson* stand for the proposition that the greater the detail obtained by police officers of the physical characteristics of the hidden material, the greater the likelihood that the action of the police officer exceeded the limited pat-down permitted by *Terry*).

Finally, consider *State v. Henderson*, 589 S.E.2d 647 (Ga. Ct. App. 2003). In this case, the Georgia appellate court held that the mere fact that a police officer with experience in narcotics testified that drugs are frequently packaged in plastic and that a coin pocket is a site used to store drugs was insufficient to support a seizure based upon *Dickerson. Id.* at 650. Any further inquiry would be outside the narrow confines of a *Terry*-type search under *Garvin* and *Hudson. Id.*; *see also People v. Blake*, 645 N.E.2d 580, 583 (Ill. App. Ct. 1995) (noting the search was more of a grope than a pat-down and suppressing marijuana packed in plastic bag); *Aguilar v. State*, 594 A.2d 1167, 1172–73 (Md. Ct. Spec. App. 1991) (holding if a police officer pats a person's clothing and finds only soft objects, further search is not allowed under *Terry*); *State v. Conners*, 994 P.2d 44, 46 (Nev. 2000) (per curiam) (suppressing evidence where the police officer concluded weapons were not present but continued hand palpitation); *Graham v. State*, 893 S.W.2d 4, 8 (Tex. App. 1994) (suppressing drug evidence where the police officer continued to rub and pinch the pocket after determining that it did not contain a weapon).

There are certainly other cases, however, that evince a more demanding approach to *Dickerson* plain-feel cases. In *In the Matter of L.R.*, a Texas appellate court considered a case where a police officer felt small baggies during a *Terry* search. 975 S.W.2d 656, 659 (Tex. App. 1998). The Texas court found that the police officer "immediately" recognized drugs as illegal substances because drugs were typically "wrapped in cellophane packaging." The Texas court concluded

that the police officer identified the contraband before manipulating the object. In my view, the evidence was pretty thin.

Similarly, in *Johnson v. State*, a police officer conducting a *Terry* pat-down felt a lump that he stated "felt like a 'ball of drugs.' " 157 N.E.3d 1199, 1208 (Ind. 2020). The *Johnson* court concluded that the police officer immediately recognized the hallmark of a narcotic packaged for sale. *Id.* Hard round objects abound, however, but the court was content to defer to the police officer's expertise.

Among other things, there are several variables in these cases. First, to what extent is the "immediately apparent" language in *Dickerson* taken at face value or regarded as rhetorical excess. Second, when does a limited *Terry* pat-down designed to be narrowly focused on a search for weapons cross the line to become an overbroad touching, whether characterized as a grope, palm press, additional pat, squeeze, or manipulation. Finally, to what extent does the trier of fact credit conclusory testimony by police officers or engage in independent review based on the totality of facts and circumstances presented.

In my view, the reviewing courts should engage in a degree of skepticism in reviewing plain-feel cases in light of the important privacy interests involved, the limited reliability of identification of unseen items, and the troublesome interaction between *Whren, Terry,* and *Dickerson* described earlier. One commentator has proposed a three-part test to aid district courts in making the determination. First, a reviewing court should examine in court the physical evidence claimed to have been identified as contraband under plain feel. *Poulin,*

42 Vill. L. Rev. at 786. Second, the court should consider objectively whether a very limited *Terry* pat-down would *immediately* establish that the suspect is carrying contraband. *Id.* at 786–87. Finally, the court should consider the narrow scope of *Terry*-type searches and examine whether the touching necessarily involved in identifying the contraband exceeded the permissible narrow scope of the warrantless and probable-cause-less search under *Terry. Id.* at 787–88.

## II. Application of Plain-Feel Doctrine in This Case.

**A. Preservation of Iowa Constitutional Claims.** Hunt asserts the admission of contraband evidence in this case violated the search and seizure provisions of both article I, section 8 of the Iowa Constitution and the Fourth Amendment to the United States Constitution. The majority asserts that while Hunt cited the Iowa Constitution, he does not argue for a different standard under the Iowa Constitution compared to the established caselaw of the United States Supreme Court under federal law.

The majority is correct. Hunt did not advance under the Iowa Constitution the argument embraced by the New York Court of Appeals in *Diaz* or Justice Scalia in *Dickerson* that the plain-feel exception should not be recognized or the evidence not admissible in later criminal proceedings. As a result, the issue is not presented in this case and, of course, the unpresented issue is not decided by the majority. And, although Hunt repeatedly claimed that the standard for application of the plain-feel doctrine was an immediately apparent standard, he did not assert that the required showing was something more than an immediate

determination of probable cause under *Williams* and some well-reasoned state law cases.

And yet, to the extent a party has not argued for a different substantive standard under the Iowa Constitution than that embraced by the United States Supreme Court and federal caselaw, we may nonetheless apply the standard in a fashion different from the federal caselaw. In short, we may apply the immediately apparent standard with more "teeth" than the prevailing federal caselaw. That is how I approach the facts in this case.

**B. Overview of the Facts.** In this case, there was no dispute that the *Whren*-type stop of Hunt was valid and that the police officers had sufficient grounds to conduct a *Terry*-type search for weapons. The record is devoid of any suggestion arising from the pat-down search that Hunt possessed any weapon. The important facts focus on the circumstances under which the police officer discovered a baggie or baggies under Hunt's clothing.

At the hearing on the motion to suppress, the police officer conducting the pat-down testified:

> I went across the sweatshirt pocket that he was wearing, the right front sweatshirt pocket, I immediately felt small plastic or small hardballs, packaged balls which were inside of a plastic bag. I could hear the crunch of the plastic bag and I could feel it, and I also felt the small individual hard packages inside of that plastic bag.

The police officer testified about his reaction when he felt the hard balls inside the plastic bag:

> I immediately knew that it was packaged drugs for sale inside of a plastic bag. It is almost invariably how cocaine, crack cocaine, or heroin are packaged for sale in Dubuque . . . . [Drug dealers] almost always put them inside of a larger plastic bag to keep them a

together so that they don't lose them in their plastics or reach in their pocket and pull it out and have one fall out and lose it.

The police officer further stated, "[O]ne of the bags felt like it was very squared off. It wasn't asymmetric in shape . . . ." But when asked if he had to manipulate or squeeze the object and determine that it was contraband, the police officer said, "[N]ot at all."

**C. Rulings of the District Court and Court of Appeals.** The district court held that the evidence should be suppressed. The district court noted that the question is whether the object in Hunt's pocket had a contour or mass that made it immediately apparent that there was probable cause that Hunt possessed drugs. According to the district court, the item in the pocket "could have been anything" and the police officer's testimony that he knew it was drugs "lacked sufficient explanation as to how and why he knew that to be true." The district court concluded that the police officer "did not know exactly what was in the bags he thought he felt." As a result, under *Dickerson*, the district court ordered suppression.

The court of appeals reversed the district court. The court of appeals noted that in other unpublished opinions, it had credited testimony from police officers regarding the identification of contraband in *Terry*-type searches. The court of appeals held that on the record before the district court, the State established that the presence of contraband was "immediately established" in light of the testimony of the officer. Although the exact nature of the drug could not be identified, the court of appeals reasoned that the precise identification of the

drug was not required so long as there was probable cause to believe contraband was present.

**D. Discussion.** The State challenges the district court's ruling, noting that all that is required under the plain-feel doctrine is for the State to establish that the officer had probable cause to believe that Hunt possessed unlawful drugs. Relying on the unreported case of *State v. Carey*, No. 12–0230, 2014 WL 3928873 (Iowa Ct. App. Aug. 13, 2014), the State contends that the experienced narcotics officer "immediately recognized" drugs as a result of packaging. The State rejected the view of some courts that the "immediately apparent" language in *Dickerson* required a higher standard of certainty than probable cause. The State contends that the unlawful nature of the substance in the baggies in Hunt's pocket was "immediately apparent" without any squeezing or manipulating of the object.

Hunt responds that *Dickerson* requires that the unlawful character of the substance must be "immediately apparent," that the officer may not engage in a search more intensive than the very limited *Terry* pat-down permitted to discover weapons, and that the officer did not know the identity of the drugs until after the baggie was removed and the material was examined more closely. While Hunt concedes that absolute certainty might not be required under *Dickerson*, the State must still show that an item's incriminating nature was "immediately apparent" and that the immediately apparent requirement is not met when an officer has multiple-choice options regarding the nature of the substance.

This is a close case based upon a very limited factual record. Based on a careful review of the record, I conclude that Hunt has the better argument. In my view, it is hard to see how the officer "immediately" knew that there were bags within bags containing drug-like substances concealed in Hunt's sweatshirt without engaging in physical contact that exceeds that permitted by *Terry*. In other words, it is hard to understand how the officer developed the detailed knowledge presented in the suppression hearing if he only conducted a mere pat-down for weapons. Instead, it appears from the facts that the officer touched the outer pocket of a sweatshirt, a very thick piece of clothing, with sufficient action to hear "the crunch of the plastic bag" and to determine that there were "bags within bags" containing small hard substances. He also testified that he determined that the bags were "very squared off." So he touched through the sweatshirt pocket with sufficient force to generate a cracking sound, pressed to determine not simply that there were bags but that there were bags within bags of some kind of material, and that one of the bags "felt like it was very squared off." This sounds more like a drug search than a search for weapons. In order to obtain such detail through a sweatshirt, the search must have exceeded the narrow and limited pat-down authorized by *Terry*. *See State v. Woods*, 680 N.E.2d 729, 732–33 (Ohio Ct. App. 1996) (holding it not reasonable to conclude a quick pat-down would provide sufficient details to identify presence of unlawful drugs); *State v. Hudson*, 874 P.2d 160, 166 (Wash. 1994) (en banc) (noting that the officer's detailed description of the cocaine found in defendant's pocket

suggested "considerable manipulation of the baggie"). As a result, I would uphold the district court's decision to suppress the evidence in this case.

I recognize that this case involves a fine-line-drawing exercise and that the majority has ultimately come to a different conclusion. I emphasize that the result in this case is fact-bound and that it does not provide a broad precedent for law enforcement to avoid the narrow confines of *Terry* and *Dickerson* even if these cases remain good law. Indeed, if *Terry* and *Dickerson* are to remain good law, the limitations in these cases must be scrupulously recognized by law enforcement and enforced by the courts.

**III. Conclusion.**

For the above reasons, I dissent. I would hold that the district court properly suppressed the evidence in this case.